```
 1                 IN THE UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                        JACKSONVILLE DIVISION

 3

 4  UNITED STATES OF AMERICA,          Jacksonville, Florida

 5                  Plaintiff,          Case No. 3:10-cr-31-J-25TEM

 6                  -vs-               Wednesday, August 11, 2010

 7  WILLIAM McCARTHY,                  1:39 p.m.

 8                  Defendant.          Courtroom 10A

 9  _____

10

11

12              TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE HENRY LEE ADAMS, JR.
13                 UNITED STATES DISTRICT JUDGE

14

15

16

17

18
   Court Reporter:
19
            Shelli Kozachenko, RPR, CRR
20          221 N. Hogan Street, #185
            Jacksonville, FL  32202
21          Telephone:  (904) 301-6842  Fax:  (904) 301-6846
            Internet:  shellikoz@gmail.com
22

23
            (Proceedings reported by microprocessor stenography;
24  transcript produced by computer.)

25
```

```
 1   GOVERNMENT COUNSEL:

 2           Rodney Brown, Esquire
             Bonnie Glober, Esquire
 3           Assistant United States Attorneys
             300 N. Hogan Street, Suite 700
 4           Jacksonville, FL  32202

 5

 6   DEFENSE COUNSEL:

 7           Kevin Darken, Esquire
             Rohom Khonsari, Esquire
 8           Cohen, Foster & Romine, PA
             201 E. Kennedy Blvd., Suite 1000
 9           Tampa, FL  33602

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              **T A B L E   O F   C O N T E N T S**

2    **DEFENSE WITNESS:**                                    **PAGE NO.**

3    TED SHAW

4         DIRECT EXAMINATION BY MR. KHONSARI          27

5         CROSS-EXAMINATION BY MR. BROWN              47

6         REDIRECT EXAMINATION BY MR. KHONSARI        84

7

8

9

10

11

12

13

14              **N O   E X H I B I T S   R E C E I V E D**

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2  Wednesday, August 11, 2010                    1:39 p.m.
 3                     -  -  -
 4            COURT SECURITY OFFICER:  All rise.  This Honorable
 5  Court is now in session.
 6            Please be seated.
 7            THE COURT:  Let's call the case.
 8            COURTROOM DEPUTY:  Case No. 3:10-cr-31-J-25TEM,
 9  United States of America versus William Joseph McCarthy.
10            Counsel, please state your appearance for the
11  record.
12            MR. BROWN:  Rodney Brown and Bonnie Glober for the
13  United States.  Good afternoon, Your Honor.
14            MR. DARKEN:  Kevin Darken and Rohom Khonsari for
15  the defendant, William McCarthy.
16            THE COURT:  Mr. Darken, why don't you come up to
17  the podium with Mr. McCarthy.
18            MR. DARKEN:  Right here, Your Honor?
19            THE COURT:  Sir, you are William Joseph McCarthy?
20            THE DEFENDANT:  Yes, sir.
21            THE COURT:  Let the record show that Mr. McCarthy
22  is present in court with his lawyer.  Also let the record
23  show that Mr. McCarthy entered a plea of guilty on March
24  11th of this year to Count One of the indictment charging
25  receipt of child pornography, a violation of Title 18,
```

1   Section 2252(a)(2) of the United States Code.

2           His plea was previously accepted.  He's adjudged

3   guilty of the offense.  A presentence report was ordered.

4   I've received a copy of the report.  I've had an opportunity

5   to review the report.

6           Mr. Darken, did you get a copy of the report?

7           MR. DARKEN:  Yes, Your Honor.

8           THE COURT:  Did you have an opportunity to meet

9   with and discuss the report with Mr. McCarthy?

10          MR. DARKEN:  Other lawyers in my firm did, Your

11  Honor.

12          THE COURT:  Mr. McCarthy, did you get a copy of

13  the report?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  And did you have an opportunity to

16  read the report?

17          THE DEFENDANT:  Yes, I did, Your Honor.

18          THE COURT:  Did you have a chance, following that,

19  to meet with and discuss it with your lawyers?

20          THE DEFENDANT:  Yes, I did, Your Honor.

21          THE COURT:  Have they answered all of your

22  questions to your satisfaction regarding this report?

23          THE DEFENDANT:  Yes, they have, Your Honor.

24          THE COURT:  Did the government get a copy of the

25  report?

1           MR. BROWN:  Yes, Your Honor, we did.

2           THE COURT:  Do either of you have any objections

3   to the factual statements contained in this report?

4           MR. BROWN:  No, Your Honor.

5           MR. DARKEN:  No, Your Honor.

6           THE COURT:  All right.  Probation calculates,

7   under the sentencing guidelines, a base offense level of 22

8   under 2G2.2(a)(1).  There's a two-level enhancement under

9   2(b)(2) of that section.  Probation determines that the

10  material involved prepubescent minors or minors who had not

11  attained the age of 12 years, so two levels are added.  Four

12  levels are added under 2G2.2(b)(4).  Probation determines

13  that the material involved a portrayal of sadistic or

14  masochistic conduct or other depiction of violence.

15          There's a further enhancement of two levels under

16  2G2.2(b)(6).  Probation determines that the offense involved

17  the use of a computer, so two levels are added.  Under

18  2G2.2(b)(7), five levels are added.  Probation determines

19  that the offense involved 600 or more images, specifically

20  determining that the offense involved 109,562 images.  The

21  adjusted offense level is a 35.  The defendant is given a

22  three-level downward adjustment under 3E1.1(a) and (b),

23  which takes it to a 32.  He has zero criminal history

24  points, so he's at a Criminal History Category I.

25          At a total offense level of 32, Criminal History

1 Category I, the range of imprisonment is 121 to 151 months.

2 There is a period of supervised release of five years to

3 life.   There's a fine range of $17,500 to $175,000, and a

4 special assessment of $100, which would be due immediately.

5          Is there any objection to the guideline

6 calculations?

7          MR. BROWN:  No objections, Your Honor, and for

8 record purposes, the United States would move for that third

9 level of acceptance of responsibility.

10          MR. DARKEN:  We have no objection, Your Honor.

11          THE COURT:  All right.  Any legal reason that

12 would preclude pronouncement of sentence?

13          MR. BROWN:  No, Your Honor.

14          MR. DARKEN:  We have no legal reason, Your Honor.

15 We do have a presentation we want to make.

16          THE COURT:  All right.  Does the government have

17 anything they want to present?

18          MR. BROWN:  Yes, Your Honor.  We filed a notice

19 requesting the opportunity to submit for the Court's viewing

20 two videos of child pornography that were received and

21 possessed by the defendant.  We would propose that the

22 courtroom need not be closed for this, but yet -- and we

23 have it on lap top.  And if the Court wished to view it in

24 chambers, we could have the agent go back and navigate it

25 for the Court, which might be the preferable way, or if the

1  Court wanted to view it on the bench, we could do that.

2          In any event, there's no reason that the gallery

3  would be subject to the viewing, and it will be less than

4  five minutes.

5          THE COURT:  Is there an objection to -- I think

6  there is an objection that's been filed by the defendant in

7  this case.

8          Counsel, do you want to be heard on it?

9          MR. DARKEN:  Briefly, Your Honor.  We object on a

10  number of grounds.  First of all, the videos are not

11  relevant to any guidelines calculation.  As the Court

12  already knows, we have no objection to the guideline

13  calculation.

14          The content of the report -- of the videos, in

15  this case paragraph 12 of the PSI very -- provides a very

16  detailed description of the 18 video clips, including the

17  length of time, the ages of the people, and a pretty graphic

18  description of the conduct, so it's our position that the

19  content of the videos has already been well described in

20  paragraph 12 of the PSI.  It's also our position -- so for

21  that reason, the videos are merely cumulative and should be

22  excluded under Federal Rule of Evidence 403.  We also think

23  they're not relevant for any legitimate purpose and

24  excludable under 401.

25          We think -- no aspersions to Mr. Brown personally,

1  we think that the government's purpose is just to inflame

2  the Court, just to get the Court mad before it imposes

3  sentence on this defendant.  We think that that would be

4  unduly prejudicial under Federal Rule of Evidence 403.  We

5  object on that ground.

6          Finally, obviously the images have been

7  self-selected by the government.  We have not been provided

8  with the images.  We have been provided with the totality of

9  what's been seized, but we have not been provided with what

10 is proposed to be presented to the Court, and we object.

11 These are self-selected.  There's no indication that they're

12 in any way representative of the whole totality of the

13 images for which the defendant's being held responsible, and

14 we don't think they're being introduced for any legitimate

15 purpose other than to inflame the Court, so we object.

16          MR. BROWN:  May I respond, Your Honor?

17          THE COURT:  Yes, sir.

18          MR. BROWN:  It's hard to imagine how evidence of

19 the defendant's crime that he committed and has pled guilty

20 to would not be relevant in determining his sentence.  I

21 could understand the Court might get mad if we were trying

22 to subject the Court to 60,875 images or 649 videos, which

23 is what he possessed.  But we're simply -- we took two

24 videos out, one of which is named in the indictment, one of

25 which is not, one of which I'm certain that the defense has

1  seen because they viewed images last week, the other of

2  which they had the opportunity to view as well.

3         As the Court in the Northern District of Ohio

4  indicated in *United States versus Cunningham*, and I quote --

5  and that's at 680 F.Supp. 2nd 844.  It says, and I quote, at

6  854, quote, "Absent examining the images, one cannot get a

7  true sense of the depravity that they depict.  Thus, the

8  Court implores any reviewing court to personally examine the

9  images at issue and not simply rely on a written description

10 of their contents."

11        The Court acknowledges that the review of such

12 images is, to say the least, uncomfortable.  There are some

13 images that are haunting and that cannot be unseen; however,

14 any uneasiness felt by the individual reviewing the image

15 pales in comparison to the harm caused by the image being

16 created in the first place.  And so that district court is

17 saying it's important to the Court's determination.  We're

18 only asking the Court to look at less than five minutes, two

19 videos, and we think it's appropriate under the

20 circumstances.

21        THE COURT:  All right.  I'm not sure that the

22 defense's objection is proper to the Court viewing these

23 exhibits, but I'm going to deny the request to do so.  There

24 is no issue as to whether or not these are pornographic.

25 There is no issue as to whether or not these images justify

1  the aggravated results that's under the guidelines.

2          I've tried a number of these cases, and I know

3  that the photographs, images, are despicable, and the movies

4  are despicable.  It would serve no useful purpose for me to

5  look at them again.  It would serve -- there is no reason

6  whatsoever for me to look at these images.

7          And I think the defense is right that it's

8  basically an effort to inflame the Court, not that it can

9  because the pictures are despicable; I know that.  So let's

10 proceed, all right?

11          MR. DARKEN:  Your Honor, we're going to have

12 Mr. Khonsari call --

13          THE COURT:  Is there anything else in aggravation

14 that the government wanted to present?

15          MR. BROWN:  Only argument, Your Honor.

16          THE COURT:  Let's do it now.

17          MR. BROWN:  May I have just a moment, Your Honor?

18          THE COURT:  Yes.

19          Counsel, why don't you and your client have a

20 seat.

21          MR. DARKEN:  Thank you, Your Honor.

22          MR. BROWN:  Your Honor, as the Court indicated,

23 the Court has seen images of -- and videos of child

24 pornography before, and, Your Honor, in this particular case

25 the collection of videos and images by the defendant was

1  massive.  As indicated in the plea agreement and

2  subsequently also indicated in the presentence investigative

3  report, Mr. McCarthy, over a period of about four years,

4  collected, using the Internet, this massive amount of

5  images.

6          And he candidly said -- when he was contacted by

7  law enforcement, he indicated, and I'm referring to page 2

8  of the factual basis of the plea agreement, that he looked

9  for all types of pornography except for bestiality and used

10  various terms.  He admitted downloading sexually explicit

11  images of children and stated that he had restored or

12  deleted those images.  He goes on to say that he used --

13  stated that the file names of the images were sometimes

14  deceptive and he acknowledged that he searched for child

15  pornography using several popular search terms.

16          He goes on to say that he denied ever molesting a

17  child, and he speculated that he'd been viewing child

18  pornography for about four years.  He indicated that he

19  found younger women appealing and that he had indeed seen

20  infant children with diapers depicted.  One of the images

21  that we had asked the Court to view today depicts an

22  extremely young female child being vaginally penetrated by

23  an adult penis, which is then seen to ejaculate, so these

24  are the type of images that Mr. McCarthy collected.

25          He indicates -- goes on to say -- denies molesting

 1  any children in the neighborhood and that he was simply

 2  driven by, quote, foolish curiosity.  He went on to

 3  essentially acknowledge that he had only recently disabled

 4  the feature that allowed him -- the images on his computers

 5  to share with other individuals.

 6          And this computer network or computer system that

 7  Mr. McCarthy had created was certainly sophisticated, one of

 8  the more sophisticated ones that the agents who investigated

 9  the case had ever seen.

10          THE COURT:  This was created by the -- are you

11  saying the file-sharing system was created by him?

12          MR. BROWN:  No, Your Honor.  What I'm saying is

13  that his computer network was created or put together by

14  him.  He used a common file-sharing program called Shareaza

15  to obtain and download images of child pornography.

16          He also indicates that while he denied any desire

17  to go pursue kids --

18          THE COURT:  What made this network that he created

19  so sophisticated?

20          MR. BROWN:  Well, it was large, Your Honor, and

21  it --

22          THE COURT:  When you say large, you're talking

23  about the number of computers that was in it?

24          MR. BROWN:  Actually I'm more talking about the

25  number of capacity or computing capacity that it had.  In

1   fact, Mr. McCarthy indicated to the agents that shortly

2   before they came to visit him with a search warrant, that he

3   had disabled the Internet file-sharing feature on it in

4   order to increase the efficiency of the system.

5           So the number of hard drives that were all sort of

6   linked together, if you will, in what's referred to as a

7   RAID configuration enabled Mr. McCarthy to have a huge

8   amount of storage capacity on these computers, like in

9   excess of a terabyte, which is a huge amount of space.

10          And indeed that huge amount of space was needed

11  for the pornography collection, which, as we've already

12  indicated, had tens of thousands of images and hundreds of

13  videos of child pornography.  Mr. McCarthy stated that he

14  found the child pornography images to be, quote, different,

15  quote, not allowed, and, quote, exciting.

16          So it appears from the evidence that Mr. McCarthy

17  had -- certainly, while there's no -- to be candid, there's

18  no charge or there's no evidence that Mr. McCarthy ever

19  molested a child or, for that matter, that Mr. McCarthy was

20  ever molested as a child.  Nonetheless, his collection was

21  prurient; it was deviant.

22          It included a number of -- I refer to them in the

23  notice as stories, and counsel corrected me a bit.  It

24  included what I would refer to as cartoon or comic-book type

25  scenarios which depict young male children -- at least the

1  ones that I brought to court -- young male children being

2  molested by adult females.  And so Mr. McCarthy had a number

3  of these stories as well.

4           It's clear from the evidence that was obtained

5  from his computers that he has a sexual interest in

6  children, which, of course, the United States would suggest

7  to the Court, is extremely dangerous and is one of the

8  reasons why Congress has seen fit to punish child

9  pornography crimes as severely as they have.  Indeed in this

10 case there is a minimum mandatory five years up to 20 years

11 in prison.  The advisory guideline range is 121 months to

12 151 months.

13          And essentially what Congress has done is

14 recognized the growing epidemic of the sexual abuse of

15 children which are then reduced to images and videos, and

16 for that reason it's appropriate for the Court today to mete

17 out a harsh punishment.

18          The Court has seen images and videos of child

19 pornography in at least seven different cases that I've

20 appeared in in the last two-and-a-half to three years, Your

21 Honor, and in those cases, just to recount a few -- you may

22 recall the case of *United States versus Christopher*

23 *Piasecki*, a 19-year-old defendant who was held accountable

24 for 11 videos.  He was charged with possession, and the

25 Court gave him 30 months in prison.  Or another case that

1  the Court heard was -- one minute, Your Honor.

2       Another that the Court heard was *United States*

3  *versus Darrell Krause*.  The Court's familiar with that case.

4  It also involved the forfeiture of a house that was agreed

5  to.  The defendant in that case was charged possession, and

6  he was held accountable for 15,000 images and 400 videos.

7  He received a 48-month sentence.

8       Or the case of *United States versus Donald Richard*

9  *Miller*, a transportation case which was tried before this

10  Court.  In that case he was found guilty of transportation,

11  and he was held accountable for about 50 images.  And when I

12  say 50 images, I want to make sure the Court understands.

13  When I refer to the word image, I'm talking about a

14  photograph, a still shot.  When I refer to videos, I'm

15  talking about a movie, whether it be a 30-second movie or

16  whether it be five minutes or an hour or what have you.  In

17  that case the Court sentenced Mr. Miller to 84 months.

18       THE COURT:  And how many were we talking about?

19       MR. BROWN:  There were 50 images.

20       THE COURT:  I don't recall that case.

21       MR. BROWN:  That was a case where the gentleman

22  who was prosecuted was from the Putnam County area, and he

23  had actually impersonated a young lesbian in order to obtain

24  images.

25       THE COURT:  Okay.

1          MR. BROWN:  You may recall that he took the stand,

2    and there was some interesting testimony that he provided

3    about his --

4          THE COURT:  I recall it.

5          MR. BROWN:  In that case the Court granted a

6    substantial downward -- I guess what we would call a

7    variance, if you will.  The applicable guidelines were

8    higher, but, again, an 84-month sentence.

9          In *United States versus Allen Sinclair*,

10   Mr. Sinclair was charged with attempted possession.  It was

11   a temporary Internet cache case wherein the defendant had

12   used a service to view images on the Internet.  He was held

13   accountable for 1300 images, still shots, and he received a

14   60-month sentence from the Court.  There was no minimum

15   mandatory that applied.

16         In the case of *Frank Carter Butcher*, another

17   forfeiture case pursuant to a plea agreement where the

18   defendant agreed to forfeit his residence, he pled guilty to

19   transportation.  He was held accountable for 600 videos,

20   actually at least 600, but on the low side 600.  The Court

21   sentenced him to a term of imprisonment of 60 months.  There

22   was a minimum mandatory.

23         *United States versus Vince Halliday*, it was a

24   receipt case, and in that particular case the defendant was

25   held accountable for 50 images and 12 videos.  The Court

1 sentenced him -- you may recall this gentleman, and I use

2 that term loosely, was on supervised release, and subject to

3 a probation search, child pornography was found.  He was

4 also violated for supervised release.

5          The Court sentenced him to 240 months in prison

6 plus consecutive time for the violation of supervised

7 release.  However, I hasten to add in that case there was

8 evidence -- it was different than this case.  There was

9 evidence of the molestation of at least one child in that

10 case, and I wanted to point that out.  We're not

11 suggesting -- I'm just giving the Court the history of some

12 of the cases the Court has handled.  But the number of

13 images was small, comparatively.

14          And then last was *John Baldwin*, another receipt

15 case.  He was held accountable for 148 images, again, still

16 shots, and the Court sentenced him to a 60-month term of

17 imprisonment.

18          I give the Court that just sort of as a

19 comparison.  The only -- of those seven individuals that

20 I've just talked about, the only one who comes anywhere

21 close to the massive collection that Mr. McCarthy had is

22 Mr. Krause, 15,000 images and 400 videos.  He had about

23 roughly 250 less videos but about 45,000-plus less images.

24          So this is something -- this case is one that I

25 know that the Court takes very seriously.  Indeed, courts

1    across the country have taken these cases seriously, and as

2    the defendant says in his memo, there are certain courts who

3    have done substantial variances.  This Court has varied

4    substantially in some cases.

5           And based upon some -- some feelings or findings

6    that the sentencing guidelines are somehow politically

7    driven, that they were not based upon empirical data and

8    rather were in response to Congress's drive or knee-jerk

9    reaction to the epidemic of child pornography and child

10   exploitation in this country -- and I would just urge the

11   Court to -- once again, to resist the urge to downward vary

12   based upon this, because as I indicated in the sentencing

13   memorandum that we -- the short memorandum that we filed

14   sort of in response to the defendant's memo, that in the

15   case of *United States versus Pugh*, a recent case which I'll

16   excerpt from a little bit later, that the Court essentially

17   rejected attacks, and the Eleventh Circuit has rejected

18   attacks, based on a lack of empirical data.

19          So it's the position of the United States that the

20   sentencing guidelines are what they are, and in fact in this

21   case, if you sort of -- I think one of the recent decisions,

22   *United States versus Irey*, wherein the Court, the Eleventh

23   Circuit, en banc, sort of lays out the procedures that a

24   district court should follow in these cases, and essentially

25   it hinges on 355(a) -- or 3553(a) factors, as well as the

1  sentencing guidelines.  And, again, I'm not drawing a

2  parallel to this case.  That was a case that was a

3  production case, and it involved the sexual abuse of 50

4  children.  And, again, I'm not drawing a parallel to the

5  facts.

6          But in the law the Court sets forth, you know,

7  that the starting point are the sentencing guidelines.  The

8  Court considers then the 3553 factors, weighing no one

9  necessarily more than the others.

10          And so, you know, it's the position of the United

11  States that applying, as that Court did, the -- they talked

12  about this just deserts principle and compared how if the

13  defendant in that case had only molested one child, then

14  they would be subject to the minimum mandatory, and yet in

15  that case the defendant had molested 50.

16          On this case, using the same analogy, if the

17  defendant, like Mr. Miller, had only received 50 images,

18  then he would still be subject to the minimum mandatory, but

19  in this case, the defendant received and possessed 61,000

20  plus, plus the videos that we talked about.  And so on the

21  scale of severity as far as cases that I've seen and that

22  this Court has seen, Mr. McCarthy is on the upper end of the

23  scale just because of the sheer volume.

24          The stories that are the cartoons or the comics,

25  whatever you want to call them, about incest, of course,

1  concern the United States as well.  The large number of

2  prepubescent children that are depicted in the videos and

3  the images as well are of concern.

4          And, of course, the Court has to consider, after

5  the appropriate sentence, what type of supervised release

6  should the Court consider after the service of whatever

7  prison term that the Court gives, and I would suggest to the

8  Court that a term of -- that a life term of supervised

9  release is appropriate.

10          First, the guidelines, while advisory, suggest

11  that and advise that, in I believe it's 5D1.1 or 1.2.  But

12  secondly, in the case of *United States versus Pugh*, which

13  I've already cited, it's clear from the legislative history

14  that Section 3583(k) reveals that -- and I quote from that

15  case, which is at 515 F.3d 1179 at page 1199, and I quote,

16  "Congress and the Sentencing Commission intended to impose

17  life terms of supervised release on sex offenders.  Congress

18  has explicitly recognized the high rate of recidivism in

19  convicted sex offenders."

20          So in this case it would be appropriate, after a

21  term of imprisonment for Mr. McCarthy, that he be subject to

22  a term of supervised release for a life term because that

23  would assist in ensuring that Mr. McCarthy doesn't fall back

24  into the old habits that brought him here to federal court

25  in the first place.

1          So the question is what is the United States'

2     recommendation for the sentencing or the incarceration

3     portion of the sentence?  Based upon the sentencing

4     guidelines, based upon the factors which are set forth in

5     3553(a) -- which of course the Court will consider the

6     nature of the offense, which is extremely severe in this

7     case, extremely large number of images collected over a

8     four-year period; the history and characteristics of the

9     defendant -- while he has no criminal history, that's not

10    unusual in these cases.  He apparently has some

11    distinguished military service.  Sadly that's less frequent

12    but not unheard of either.

13         I think there's a psychologist that the defendant

14    will put up and you'll hear some questions for, and the

15    defendant recounts some of those personal characteristics as

16    well.  The fact of the matter is that the defendant has a

17    disturbing sexual interest in young children, and the Court

18    needs to take into account the deterrent effect of his

19    sentence as 3553(a) counsels as well, not only general

20    deterrence, that is, to promote respect for the law and the

21    need for having a just sentence, but also to deter others

22    who might wish to engage in this type of offense, and

23    further, to deter the defendant from backsliding when he's

24    released from prison as well.

25         And so there also the Court has to consider

1  alternatives.  I would urge that there is no appropriate

2  alternative to imprisonment in this case.  I understand that

3  there are certain sex offender treatment programs in the

4  Bureau of Prisons that are highly regarded, and of course

5  the Bureau of Prisons makes the final decision on that, but

6  the United States would recommend that a term of

7  incarceration that is significant would be helpful in

8  allowing the defendant to be -- submit to one of those sex

9  offender treatment programs.

10         And so therefore, it's the United States'

11 recommendation to the Court that the defendant be sentenced

12 to a term of 121 months in prison, which is the low end of

13 the applicable sentencing guideline.  It's twice the minimum

14 mandatory.  It's essentially a ten-year sentence.  It's --

15 it is higher than some of the other cases that -- some of

16 the other cases in which the Court has sentenced defendants,

17 but in large part that's because this is a more significant

18 case involving more significant volumes of images.

19         And I'd just like to end United States'

20 presentation with one of the victim impact statements that

21 was prepared and which one of the victims whose images this

22 defendant was found with submitted and asked that it be read

23 and asked that the Court take this to heart in determining

24 the appropriate sentence.

25         This is the victim in the Vicky series.  It reads:

1  "To whom it may concern:  My name is blank.  I am 19 years

2  old, and I'm living every day with the horrible knowledge

3  that someone somewhere is watching the most terrifying

4  moments of my life and taking grotesque pleasure in them.

5  I'm the victim of the worst kind of exploitation, child

6  porn.  Unlike other forms of exploitation, this one is never

7  ending.  Every day people are trading and sharing videos of

8  me as a little girl being raped in the most sadistic ways.

9  They don't know me, but they've seen every part of me.

10  They're entertained by my shame and my pain.

11          "I had no idea the Vicky series, the child porn

12  series, taken of me had been circulated at all until I was

13  17.  My world came crashing down that day, and now, two

14  years later, not much has changed.  These past years have

15  shown me the enormity of the circulation of these images and

16  added to my grief and pain.  This knowledge has given me a

17  paranoia.  I wonder if the people I know have seen these

18  images.  I wonder if the men I pass in the grocery store

19  have seen them.  Because the most intimate parts of me are

20  being viewed by thousands of strangers and traded around, I

21  feel out of control.

22          "They are trading my trauma around like treats at

23  a party, but it is far from innocent.  It feels like I'm

24  being raped by each and every one of them.  What are they

25  doing when they watch those videos anyway?  They're gaining

1  sexual gratification from images of me at ages 10 and 11.

2  It sickens me to the core and terrifies me.  Just thinking

3  about it now, I feel myself stiffen and I want to cry.  So

4  many nights I've cried myself to sleep thinking of a

5  stranger somewhere staring at their computer with images of

6  a naked me on the screen, and I have nightmares about it.

7         "My paranoia is not without just cause.  Some of

8  these perverts have tried to contact me.  One has found me

9  -- one tried to find me through my friends on MySpace.

10  Another created a slide show of me on YouTube.  I wish one

11  day I could feel completely safe, but as long as these

12  images are out there, I never will.

13         "Every time they're downloaded, I'm exploited

14  again; my privacy is breached; my life feels less and less

15  safe.  I will never be able to have control over who sees me

16  raped as a child.  It's all out there for the world to see,

17  and it can never be removed from the Internet.  I only ask

18  that those who have exploited me be brought to justice to

19  hopefully deter some others from doing the same and to

20  lessen my shame."

21         Thank you, Your Honor.

22         THE COURT:  Mr. Darken?

23         MR. DARKEN:  Your Honor, Mr. Khonsari is going to

24  call Dr. Shaw briefly.

25         MR. KHONSARI:  Your Honor, the defense would call

1  Dr. Ted Shaw.

2          THE COURT:  Come up and be sworn, sir.

3          COURTROOM DEPUTY:  Sir, please raise your right

4  hand.

5          Do you solemnly swear that the testimony you're

6  about to give before this Court will be the truth, the whole

7  truth, and nothing but the truth, so help you God?

8          THE WITNESS:  I do.

9          COURTROOM DEPUTY:  Thank you.  Please have a seat.

10         Sir, please state your full name and spell your

11 last name for the record.

12         THE WITNESS:  Ted Shaw, S-h-a-w.

13         COURTROOM DEPUTY:  Thank you.

14         THE WITNESS:  Let me just take a little water,

15 please.

16         MR. KHONSARI:  Your Honor, before I begin with

17 Dr. Shaw, I've provided the government with a portion of

18 Dr. Shaw's report that Dr. Shaw had forgotten to include in

19 the original that was submitted to the Court.  I have an

20 extra copy for the Court if you'd like me to --

21         THE COURT:  Bring it up.

22         MR. KHONSARI:  And, Your Honor, the Abel test is

23 referenced in his report.  That's just a more specific

24 conclusion regarding it.

25         THE COURT:  Let's proceed, Counsel.

1           MR. KHONSARI:  Thank you, Your Honor.

2                         -  -  -

3                     **TED SHAW,**

4    having been produced and first duly sworn as a witness,

5    testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. KHONSARI:

8    **Q.**     Dr. Shaw, could you please tell the Court your level

9    of education?

10   **A.**     Certainly.  I have a bachelor's degree in English

11   from New York University, a master's and specialist degrees,

12   counselor of education, from the University of Florida, and

13   a Ph.D. in counseling psychology from the University of

14   Florida.  I also have a two-year post-doc specifically in

15   the evaluation and treatment of sex offenders.

16   **Q.**     Dr. Shaw, what do you presently do employment-wise?

17   **A.**     I'm a licensed psychologist and a founding partner of

18   a business called The ITM Group, which is a group of mental

19   health professionals.  We specialize in the evaluation and

20   treatment of sex offenders, but we also provide other forms

21   of treatment, counseling, and evaluation throughout Florida.

22   **Q.**     Other than working at ITM, what other employment do

23   you have, sir?

24   **A.**     Well, I have a number of contracts.  As a

25   psychologist, I'm contracted with the Department of Children

1  & Families to do evaluations under the Sexually Violent

2  Predator Act, what used to be known as the Jimmy Ryce Act.

3         I also have contracts with Department of Juvenile

4  Justice, Department of Children & Families to -- I do

5  dependency evaluations for the Department of Children &

6  Families where there's sexual allegations involved.  And

7  then I have been directing what I believe to be the largest

8  outpatient program in Florida for adolescents who sexually

9  offend since 1985, under contract with the Department of

10 Juvenile Justice, and for the last 15 years, I've done a lot

11 of evaluations for sentencing for DJJ.

12        I also consult with treatment programs, do

13 training for staff.  I do training for Department of

14 Corrections, for their probation officers.  In that light

15 the Department of Juvenile Justice established sex offender

16 specialist probation officers, and I give the statewide

17 training for those officers.  When the Florida Department of

18 Corrections established sex offender specialist probation

19 officers, I had the contract to do the training for those

20 officers, although that was a number of years ago.

21 **Q.**    Dr. Shaw, are you involved in any publications, or

22 have you made any presentations with regards to sex

23 offenders or the field of child pornography?

24 **A.**    Yes.  In terms of publications, I've not published

25 regarding possessors of child pornography as of yet.  I am

1  supervising a dissertation right now where we're looking at

2  the relationship between men who have looked at child

3  pornography but have not been caught for it and what that

4  might lead to in the future.  And I do have a book chapter

5  appearing in a book that's being published, should be

6  released this week, on the long-term impact upon men of

7  being sexually abused as boys.

8          I have published in peer-reviewed journals on

9  determining what type of sex offender is likely to do well

10 in treatment, on how to challenge denial in sex offenders,

11 on how to treat adolescent -- adolescents who sexually

12 offend.  I do have another article that has been submitted

13 for publication that looks at the efficacy of polygraphing

14 adolescents who sexually offend, which is not routine as it

15 is with adults.

16         In terms of my presentations, I've been presenting

17 throughout the country and in other countries for my whole

18 career, but most recently, I have presented a few times in

19 the last year and a half on female sex offenders, which is a

20 subspecialty of mine.  And then most recently at last year's

21 international conference with the Association for the

22 Treatment of Sex Abusers, I presented a review of the

23 literature on child pornography offenders and the best -- in

24 my opinion, best way to evaluate them for sentencing

25 considerations.  And this year I will be presenting a full

1   eight-hour presentation at the conference essentially

2   teaching advanced clinicians how to do essentially what I'm

3   doing today.

4   **Q.**    What professional memberships and affiliations do you

5   have, Dr. Shaw?

6   **A.**    Well, I'm first and foremost a clinical member of

7   ATSA, the Association for the Treatment of Sex Abusers --

8            THE COURT:  Come on, Counsel.  We need to get

9   going.

10           MR. KHONSARI:  Your Honor, I would tender Dr. Shaw

11  as an expert in this field.

12           MR. BROWN:  No objection.

13           MR. KHONSARI:  Judge, if I could follow up with

14  just one follow-up question with regards to Dr. Shaw's --

15  actually just a couple very brief questions.

16  BY MR. KHONSARI:

17  **Q.**    Dr. Shaw, do you solely testify for the defense in

18  these types of cases involving sex offenders or people

19  involved with child pornography?

20  **A.**    No.

21  **Q.**    Okay.  How often do you testify for the State and how

22  often do you testify for the defense?

23  **A.**    It depends on the crime.  Child pornography, I've

24  only been hired once by the government.

25  **Q.**    Okay.

**A.**      I did not testify, but my report was presented as evidence.

**Q.**      With regards to risk assessment of sex offenders, how often have you been -- how often have you testified for the government and how often have you testified for the defense?

**A.**      Probably somewhere around half and half.  In terms of my civil commitment testimony, I primarily testify for the prosecution.  In sentencing, mitigation, I probably testify more often for the defense, although I am a witness for the prosecution in sentencing as well.

**Q.**      Okay.  And finally, Dr. Shaw, how many evaluations of Internet child porn cases have you done?

**A.**      About a hundred.

**Q.**      Okay.  And do you write a report in all those cases?

**A.**      No.

**Q.**      And why do you not write a report in some cases?

**A.**      Well, if my opinion is not desired by the person who hired me.

**Q.**      Okay.  With regards to Mr. McCarthy specifically, could you tell the Court what materials you were provided that you reviewed prior to meeting with Mr. McCarthy?

**A.**      I was provided with the discovery materials about the investigation and listing some of the material that was on his computer.  Between my first and second interview of Mr. McCarthy, I received a copy of the presentence

1 investigation report.

2 **Q.**     Have you had an opportunity to review some of the

3 images and videos that Mr. McCarthy has been charged with?

4 **A.**     I did just recently.  I think about a week and a half

5 ago I had a chance to review a sampling of the materials

6 that were on his computer.

7 **Q.**     Okay.  What tests did you have Mr. McCarthy do with

8 regards to you evaluating Mr. McCarthy?

9 **A.**     Well, I asked Mr. McCarthy to subject himself to

10 several polygraphs.  We did an Abel Assessment For Sexual

11 Interest, two computer-administered psychological

12 inventories, and then I scored the Hare Psychopathy

13 Checklist, which is an instrument that is scored by a

14 combination of record review and interview.

15 **Q.**     Did you have an opportunity to sit with Mr. McCarthy

16 and speak to him about his life and his experiences?

17 **A.**     Yes, for a number of hours.

18 **Q.**     How would you describe Mr. McCarthy's personality to

19 the Court?

20 **A.**     Mr. McCarthy is an eccentric individual and very

21 private individual, very kind of solitary and someone who is

22 relatively mistrustful of others.  The seeds of that can be

23 found in his experiences as a teenager of losing both of his

24 parents in one year and then having a number of negative

25 experiences in foster care, really sort of finding himself

1  in the military, which is where he got apparently most of

2  his technical and computer training.

3         He's the kind of person who, before computers,

4  would have been a bookworm.  He mentioned that he -- when he

5  was younger, he did a lot of reading of encyclopedias,

6  and -- but who, since the advent of the Internet, spends a

7  great deal of time or has spent a great deal of time on the

8  Internet.  Of course, his business has been with computers,

9  so he's very comfortable with them and of course had, as the

10  prosecution mentioned, a massive amount of memory in his

11  computer compared to someone like me, for example.

12         He's somebody who is not antisocial; in other

13  words, there's no evidence of ongoing criminality.  He has

14  no criminal record beyond the index offense.  He has no

15  history of violence, no history of sexual violence of any

16  kind.  He, as was mentioned by the prosecutor, has

17  apparently an honorable discharge from the military, did

18  four years, and had a reasonable work history, although,

19  again, rather eccentrically, has been living for the past

20  ten years very frugally on his savings without being

21  employed and has been considering starting up a business of

22  his own, so --

23  **Q.**    Dr. Shaw, did you -- in speaking to Mr. McCarthy, did

24  you have any experience and talk to him about any kind of

25  hoarding that he had done in his life?

**A.**     One of the primary features of his personality is compulsivity, and he is a chronic saver, the kind of person who might save bottle caps or whatever, but he accumulates stuff, and that's part of, I'm sure, his motivation for having an enormous hard drive.

           And as I'm sure the Court is aware, a lot of the people who download pornography, including child pornography, use -- do what is known as bulk downloading through peer-to-peer file sharing where they often will set their computers for -- to automatically download material, and then they go back and review the material later.  Many people just erase what they're not interested in but not everyone.

**Q.**     In the test that you did on Mr. McCarthy, did you see any psychopathic tendencies?

**A.**     No.  Mr. McCarthy is very low in psychopathy; this is the traits of criminality or antisocial personality.  He does not have that issue.  He does have others which I listed in the diagnostic section, although I did not find him to meet criteria for a personality disorder.

           He has essentially lived a functional life. Absent -- other than this -- behaviors associated with child pornography, there's no evidence that he has led a criminal lifestyle or engaged in behaviors that were disrespectful of the rights of others.

1  **Q.**     What does the lack of antisocial behavior and the

2  lack of psychopathic tendencies -- how does that relate to

3  your evaluation of Mr. McCarthy in this case?

4  **A.**     Psychopathy's specifically related to risk for most

5  offenders and to performance while on bond or probation and

6  to completion of treatment.  Psychopaths are not very

7  treatable.  We don't really know how to treat them, and

8  there's quite a bit of research about that, and they intend

9  to be more dangerous than people who are low in psychopathy.

10 **Q.**     Could you explain to the Court what the Abel testing

11 is and how Mr. McCarthy did on the Abel test?

12 **A.**     The Abel Assessment for Sexual Interest represents

13 one of the few instruments that are part of a trend in the

14 sex offender evaluation and treatment field to understand

15 people's sexual interests.  It essentially is replacing the

16 penile plethysmograph that we used to use that was quite

17 invasive and had a lot of reasons to be inaccurate.

18         The Abel Assessment is based on visual reaction

19 time, and it has three components.  The first component is

20 viewing images of children and adults, male and female, and

21 beyond -- the person's ability to fake his interest or her

22 interest in these images is determined.  On that -- do you

23 want me to give the results?

24 **Q.**     Yes, sir.

25 **A.**     On that component Mr. McCarthy showed an interest in

1  adults and adolescent females, in that order, which is

2  considered normal for adult heterosexual males.

3          THE COURT:  Adults and adolescent females?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  What do you consider to be adolescent

6  females?

7          THE WITNESS:  These would be postpubescent

8  females.  They're probably 14 and over, so they -- if they

9  were nude, if it were pornography, it would be potentially

10 illegal.

11         These people in these images are clothed, so

12 they're not -- it's not pornography, but it is -- it's the

13 most accurate instrument that we have available to us now

14 for assessing sexual interest beyond a person's ability to

15 fake, because people, when you ask them, they're always

16 going to say, "Oh, I'm just attracted to teenagers and

17 adults."

18         But these results -- the results Mr. McCarthy

19 produced are similar to the control normals who were tested

20 on the Abel.  So it's not abnormal to find adolescent

21 females attractive for adult heterosexual males.  We're not

22 supposed to act on it, but it's not abnormal to find them

23 attractive.  And, of course, that could be 18- and

24 19-year-olds as well.

25 BY MR. KHONSARI:

1   **Q.**     Dr. Shaw, when you mentioned the results, you said

2   adult and adolescent in that order.  Can you explain that?

3   **A.**     Yeah.  He would show more interest in adult females,

4   less significant interest in adolescent females.  He did not

5   show any interest in prepubescent children, either school

6   age or preschool.

7   **Q.**     And that portion of the Abel test, that is a

8   scientific test?

9   **A.**     Yes.

10  **Q.**     Okay.  So you heard --

11  **A.**     It's an objective test.

12  **Q.**     Okay.  You heard the prosecution earlier.  You've

13  been in the courtroom the whole time, correct, Dr. Shaw?

14  **A.**     Yes.

15  **Q.**     You heard the prosecution earlier indicate that -- I

16  believe I quoted Mr. Brown saying a disturbing sexual

17  interest in young children.  The results of the Abel test

18  showed what with regards to Mr. Brown's statement?

19  **A.**     That he's not interested in prepubescent children.

20  **Q.**     Okay.  Did you have Mr. McCarthy go through a

21  polygraph?

22  **A.**     Yes.

23  **Q.**     All right.  And what were the questions that you had

24  Mr. McCarthy polygraphed on?

25  **A.**     May I look at my report, please?

1  **Q.**    Yes, sir.

2  **A.**    The polygrapher had to do two separate tests.  The

3  first test, Mr. McCarthy acknowledged that he had had a

4  17-year-old girlfriend when he was 18.  He was asked other

5  than that did he sexually touch anyone else under 18 years

6  old and did he have any sexual contact with anyone under 18.

7  He said no to that, and there was no deception indicated.

8       In the second test he was asked, "Did you

9  masturbate to any prepubescent child porn?" and a second

10  question for sexual excitement, "Did you view any

11  prepubescent child porn?" and then third, "Did you buy any

12  of the child porn?"

13       Again, he answered no to those questions, and no

14  deception was indicated.

15  **Q.**    Dr. Shaw, if I could stop you for one second.  With

16  regards to that line of questioning that you had

17  Mr. McCarthy polygraphed on and no deception was indicated,

18  not masturbating or not viewing these images of prepubescent

19  children for sexual purposes, is that remarkable in your

20  field and what you've experienced thus far with sex

21  offenders?

22  **A.**    What's remarkable in terms of my experience thus far

23  with child porn viewers, generally when I say to someone in

24  the interview, "Have you ever masturbated to images of child

25  porn?" they always say no.  And then I say, "Are you willing

1  to be" -- or, "Do you understand that I'm going to want you

2  to be polygraphed on that answer because everyone says no?"

3  and then they usually say -- or they always say, "Well, I

4  may have masturbated to some of them," or, "I know I did,"

5  or whatever, and we go on with the evaluation.

6        This was the first case that I have had where the

7  person was willing to be polygraphed and then actually

8  passed the polygraph.  I think a lot of times a lot of

9  people said they were going to be polygraphed, but I was

10 never provided with the results of a polygraph on that

11 question before.

12 **Q.**    Okay.  If we could go on with the polygraph, what

13 else was asked of Mr. McCarthy?

14 **A.**    Excuse me.  I've spilled some water on the desk, and

15 I wonder if there's a paper towel.  I apologize.

16        THE COURT:  We won't put you in prison for it.

17        THE WITNESS:  My aim was bad.  Thank you so much.

18 Thank you.  I'm really sorry.

19        That's actually -- the other two questions -- a

20 second question was to confirm the first question.  In other

21 words, he was asked in a second way, "Did you find the

22 viewing of prepubescent children sexually exciting?" and he

23 answered no and passed on that.

24        The third one, which I think is significant, "Did

25 you buy child pornography?"  I consider that significant

1 because in my opinion people who pay for child pornography

2 are clearly supporting the industry and the market of child

3 pornography, while people who engage in peer-to-peer

4 downloading, while perpetuating the victimization of

5 children, are not actually supporting the profit industry as

6 is clear from the music industry and the video industry

7 where a great deal of effort is done to prevent peer-to-peer

8 file sharing.

9           So that's why I often ask that -- if the person

10 says they haven't paid for it, I asked for that to be

11 polygraphed.

12 BY MR. KHONSARI:

13 **Q.**     Have you done research, Dr. Shaw, on recidivism and

14 the risk to reoffend?

15 **A.**     I can't say that I have reviewed the recidivism of my

16 own clients, the thousand or so sex offenders that we treat

17 each year.  I have an idea, but I've not done formal

18 recidivism research.  I have contributed data from my

19 program to large recidivism studies, and I have, of course,

20 reviewed the results of virtually ever recidivism study that

21 is out there on sex offenders.

22 **Q.**     With all the tests that you did on Mr. McCarthy,

23 including the polygraph, the Abel testing, and the other

24 tests that you performed, what can you tell the Court about

25 your opinion as to Mr. McCarthy's risk to reoffend?

1   **A.**      Well, from everything I've reviewed about

2   Mr. McCarthy and from the research that is currently

3   available on people who view child pornography, Mr. McCarthy

4   has to be seen as a very low risk to reoffend by viewing

5   future child pornography or to go on to, say, molest a

6   child.

7           The research that has been done has identified

8   some risk factors, the most notable of which are prior

9   arrests or convictions for child pornography possession,

10  prior arrests or convictions for sexual offending, hands-on

11  sexual offending, or for violent offending.  Mr. McCarthy

12  has none of those.

13          Additionally, age has been noted as a potential

14  risk factor.  He is certainly already in his late 50s, and

15  even if he gets the minimum mandatory sentence, he will be

16  60 or over by his release, which is considered pretty much

17  the cut-off for reducing the risk of sex offender

18  recidivism.

19          The most widely used recidivism risk instrument

20  for contact sex offenders known, as the Static-99R, which is

21  an instrument that has a score from zero to 13, reduces the

22  score by three when a person reaches the age of 60.  It

23  reduces the score by one when a person reaches the age of

24  40, so that's how age is seen with contact sex offenders.

25          There is no yet -- and I put this in my report.

1  We have no scientific mathematical matrix to assess risk for

2  people who view child pornography.  The understanding of

3  that crime and the people who commit it is too young to have

4  the vast numbers.  But what we do know is that the number of

5  images is growing each year that we look at the total number

6  of people who have been arrested for child pornography.

7         So just as the drives on my computer and my -- the

8  programs I have and what I have is much larger today than it

9  was ten years ago, the -- unfortunately, the proliferation

10  of child pornography, which keeps being added to but which

11  for some reason that I don't understand can't be deleted, is

12  just getting bigger and bigger.  So people who are

13  particularly -- because most people use peer-to-peer file

14  sharing, everybody is having bigger and bigger numbers, and

15  I'm sure the Court has seen each year now larger and larger

16  amounts.

17         So far there has been no evidence that the amount

18  that a person has has any correlation to their problem.  In

19  other words, people who are smarter and have better computer

20  equipment and do peer-to-peer file sharing are going to have

21  more stuff than the people who don't really know what

22  they're doing or have a smaller version.  There's no

23  evidence to show that that means anything clinically, and

24  there's not a single researcher suggesting that it does.

25         Again, digital -- quantity of digital stuff,

1 although the law seems to suggest it, is very different

2 than, say, quantity of gold coins.  If I take -- if I have a

3 million gold coins, it's different than if I have ten gold

4 coins.  On -- digital information can be put on a little

5 drive, and we don't have the same sense of it.  So although

6 it is appalling in some ways and we have an emotional

7 reaction to it, it does not appear to be related to risk.

8         In any event, Mr. McCarthy is a person who has

9 lived a productive life.  He owns his own home.  He -- well,

10 he has owned his home.  He won't soon.  He is in an adult

11 relationship, a committed relationship, with a woman and has

12 had prior committed relationships.

13         He is an unusual guy.  He does not have the

14 characteristics that I would associate with high risk.

15 **Q.**     Did you make any findings with regards to pedophilia

16 and Mr. McCarthy?

17 **A.**     Yes.  And, again, I want to say I did look at the

18 images on his computer, and there's a vast amount of

19 prepubescent children, images of prepubescent children, from

20 infants up to 10 or 12.  I don't know how much adult

21 pornography he had, and I don't know how much he had that

22 were of teens that was legal or barely legal --

23         THE COURT:  Was there any adult pornography found

24 on the machine?

25         MR. KHONSARI:  Judge, when Dr. Shaw and I went and

1  spoke with the agents last week, I actually asked the

2  forensic agent if he had looked for anything other than

3  child pornography, and if I'm incorrect in the answer, I

4  believe that the agent said that he was only looking for

5  child pornography.

6          Judge, I can tell the Court that he had adult

7  pornography on the machines as well.  He had numerous other

8  videos that were -- that had nothing to do with pornography

9  of any kind, so I can represent that to the Court at this

10  time.

11          THE COURT:  Go ahead.

12          MR. KHONSARI:  Thank you, Judge.

13  BY MR. KHONSARI:

14  **Q.**     Findings with regard to pedophilia, Dr. Shaw?

15  **A.**     So in spite of the large number of images, based on

16  his responses on the polygraph that he has never masturbated

17  -- never masturbated to images of prepubescent children,

18  which -- and that -- and the results of the Abel that showed

19  a lack of an interest in prepubescent children, I don't find

20  a reason to diagnose him with pedophilia.  He did have those

21  images there on his computer, and other than hoarding and

22  not bothering to erase stuff, he doesn't have an

23  explanation.

24          Certainly he's admitting that he has likely

25  masturbated to images that would be considered illegal of

1  postpubescent adolescents.  But what's important about that

2  is that that is not a sign of pedophilia (1), and (2) it's a

3  lot easier to treat because there are plenty of legal age

4  women who look like teens, who have that sort of body type,

5  you know, women in their 40s, 50s, 60s, whatever.

6          It's just the hardest sex offenders -- among the

7  hardest to treat are men who are only attracted to

8  prepubescent children and are not attracted to adults and

9  adolescents.  Mr. McCarthy is the opposite of that.  He does

10  not show any attraction to prepubescent children, but he

11  does show an attraction to adults and adolescents, which is

12  considered normal.

13  **Q.**    What would you say, Dr. Shaw, with regards to

14  treatment for Mr. McCarthy?

15  **A.**    Mr. McCarthy has some quirks, some personality issues

16  that I think would benefit from treatment.  I think overall

17  he's a guy who has some trouble being happy in the

18  traditional way.  He has -- he's kind of isolative.  He has

19  trouble trusting people.

20          These things, as I mentioned in my report, are

21  actually commonly treated in sex offender treatment.  When

22  he gets out on probation, he's going to be referred to the

23  provider who has the contract to treat sex offenders.  I

24  didn't mention it, but my group has the contract to treat

25  federal probationers in, I think, 9 or 11 counties, and --

1  not up here but in other places.

2          And I don't think he -- I should say two things.

3  One, we are finding that the people who look at child

4  pornography in general, if they pass a polygraph that they

5  haven't molested children, that they don't need full-blown

6  sex offender treatment as we would normally give to contact

7  sex offenders.  And I feel that way about Mr. McCarthy, that

8  he will need a short version of that treatment.

9          Or he could potentially get some of that in the

10  five prisons where they have outpatient treatment available

11  where you live in the prison but you go to group twice a

12  week.  And the Bureau of Prisons recently established five

13  programs at five different prisons which he can volunteer

14  for, which is different from the very large or very

15  intensive residential program where they are looking for the

16  more disturbed offenders who are the ones who have also

17  molested children or produced child pornography or something

18  like that.

19          So he is amenable for treatment.  He is a guy who

20  will do whatever it takes to make the rest of his life be a

21  life of freedom.  He has done fine while he's been on

22  supervised release now, and I'm sure he'll do fine on

23  probation.

24          MR. KHONSARI:  Your Honor, may I have a moment?

25          THE COURT:  Yes.

1          MR. KHONSARI:  Judge, I have no further questions

2  for Dr. Shaw.

3          THE COURT:  Cross-examination.

4                    CROSS-EXAMINATION

5  BY MR. BROWN:

6  **Q.**     Good afternoon, Dr. Shaw.

7  **A.**     Good afternoon.

8  **Q.**     How many times have you acted as an expert in federal

9  criminal cases?

10 **A.**     In court?

11 **Q.**     Yes.

12 **A.**     Maybe 24 times, 25 times maybe.

13 **Q.**     Okay.  24 or 25?

14          And how many times of those 24 or 25 times were

15 you testifying as the United States' witness and how many

16 times as a defense witness?

17 **A.**     Once for the prosecution.

18 **Q.**     Okay.  So 23 --

19 **A.**     And that's in addition to the report of mine that was

20 submitted for evidence.  I did that.

21 **Q.**     Okay.

22 **A.**     I wasn't called to testify.

23 **Q.**     And so essentially you've been retained by the

24 government, the United States -- and I'm not talking about

25 the civil commitment side or the State of Florida.  I'm just

1  talking about federal cases.  You've been retained one time?

2  **A.**    For testimony.

3  **Q.**    Okay.

4  **A.**    I have submitted a number of reports.  There was a

5  time where the federal prosecutors were routinely getting

6  psychological evaluations from experts, and I did submit

7  several dozen reports at that time, but not in the -- what I

8  just named there is what I've done in child pornography.

9  **Q.**    Okay.  How long ago was that?

10  **A.**    I can't say.  It was maybe seven or eight years ago.

11  **Q.**    Okay.  How much have you been paid for your services

12  in this case?

13  **A.**    My hourly rate is $300 an hour.

14  **Q.**    Okay.  So can you tell us -- do you have an estimate

15  of how much you've been paid or how much you're due to be

16  paid?

17  **A.**    I have worked 20 or more hours.

18  **Q.**    20 or more hours?

19  **A.**    So maybe $6,000.

20  **Q.**    Do you get paid more if you're in court as opposed to

21  if you're just in your office preparing documents?

22  **A.**    No.  I charge the same rate for my time whatever I'm

23  doing.

24  **Q.**    And do you get travel as well?

25  **A.**    I charge for my time.

1   **Q.**     Okay.  You indicated that you had spent some time

2   with the defendant in the course of your evaluation.  About

3   how much time did you spend in hours?

4   **A.**     About five hours.

5   **Q.**     Okay.  And is that you personally?

6   **A.**     Right, me personally.

7   **Q.**     Okay.  And that's over two -- I think your report

8   says over two sessions?

9   **A.**     Correct.

10  **Q.**     Okay.  And you reviewed the discovery in this case.

11  **A.**     Yes, sir.

12  **Q.**     And did you review the plea agreement?

13  **A.**     I believe so.  It sounded familiar when you discussed

14  it, yes.

15  **Q.**     Okay.  So the part when I was talking about how he

16  used search terms to obtain child pornography --

17  **A.**     Yes, I reviewed that.

18  **Q.**     -- you're familiar with that?

19           And how he described child pornography as

20  exciting?

21  **A.**     Yes.

22  **Q.**     How does that square with your opinion that

23  essentially he didn't receive what the polygrapher called

24  sexual excitement from images of child pornography?

25  **A.**     Well, first of all, the term -- child pornography is

1  a broad term that includes illegal images of children.  Many

2  images of child pornography would be sexually exciting to

3  adults as they're postpubescent kids and many of them look

4  pretty mature.  They have breast development and pubic

5  development.

6         So I tested him on the issue of prepubescent

7  children, so I think in acknowledging some excitement with

8  child pornography, I think he was referring to adolescents,

9  to postpubescent kids, which could be as young as 10 and a

10 half or 11.  Girls in America reach puberty pretty young,

11 and that's what I tested him on, not on -- so I didn't ask

12 him, "Did you masturbate to child pornography?"  Obviously

13 he did.  I wanted to know was he masturbating to the

14 prepubescent children.

15        That's where I see his problem, what he's really

16 interested in is adolescents.  As I'm sure you know, even

17 under standard terms and titles, there's a lot of mixed

18 stuff that people get.  And, you know, my understanding is

19 that a lot of times when people are downloading downloads,

20 they're not interested in everything.  So that's my

21 understanding, my explanation to the best of my ability.

22 **Q.**     But if they sort it like Mr. McCarthy did, then that

23 would -- would you agree that that would show some interest

24 in the particular matter that was sorted?

25 **A.**     Well, it may show an interest of some kind, but what

1  I was looking for was sexual interest, and that's what I

2  didn't find.  I think it could be curiosity.  I mean, I'm a

3  person who's seen an enormous amount of child pornography

4  and, you know, I'm pretty inured to it at this point, but --

5  **Q.**     Well, in fact -- let me just interrupt you there.  In

6  fact, you maintained a collection of child pornography,

7  correct?

8  **A.**     No, I don't -- I have no child pornography, no.

9  **Q.**     No.  I was speaking in the past tense.  You have

10 maintained --

11 **A.**     Oh --

12 **Q.**     -- a collection in the past.

13 **A.**     -- in the '70s and '80s, the FBI provided child

14 pornographic images to treatment centers and research

15 centers around the world to test people using child

16 pornography.  It was always troubling for us and difficult

17 for us.  And the field made an effort in the -- throughout

18 the '90s to come up with an alternative that would be as

19 powerful.

20         And, frankly, the alternatives have never been

21 quite as powerful, and that's why the penile plethysmograph

22 instrument kind of went out of favor because without showing

23 child pornography, it was hard to get men to have erections

24 in the laboratory, whereas back when we had child

25 pornography, we could.

1        But it was -- so yes, I didn't personally, but the

2   State of Florida -- I was the director of the State of

3   Florida's secure residential treatment program, and the

4   treatment program itself, under the auspices of the

5   department of forensic psychiatry at the University of

6   Florida, did have a set of slides that were provided to us

7   by the FBI.

8   **Q.**     And you had access to that.

9   **A.**     Absolutely.

10  **Q.**     Okay.  So we were talking about how Mr. McCarthy had

11  his images arranged on his computer.  You've reviewed this

12  forensic report?

13  **A.**     I reviewed the forensic report, and I also reviewed

14  what was available to review.

15  **Q.**     And so do you maintain your opinion that he was only

16  excited, if you will, to images of -- and you don't use the

17  term postpubescent in your report.  You used the term

18  adolescent.  Is that fair?

19  **A.**     Actually I thought I did use the term pre- and

20  postpubescent, but, I mean, in general --

21  **Q.**     Well, you didn't --

22  **A.**     Well, I want to say in general, adolescence or, you

23  know, the emergence of puberty is what I'm talking about.

24  **Q.**     Well, the term adolescent would cover more than just

25  post- -- immediately postpubescent children, wouldn't it?

1  **A.**      Well, I think that is the beginning of adolescence.

2  **Q.**      Of course.

3  **A.**      That's when the hormones start moving and people's --

4  and kids start to get secondary signs of puberty, so I

5  don't -- I don't want to argue with you.  My intention

6  was -- postpubescent/prepubescent is technically what I'm

7  saying.  Maybe I used the term -- I think adolescence is

8  reasonable, but I can see what you're saying, that we think

9  of an adolescent as older than, say, 11.

10 **Q.**      Well, you would agree that adolescent is a less

11 inflammatory term than postpubescent.

12 **A.**      Not in my business.

13 **Q.**      Okay.  So that's not why you chose not to use it in

14 your report?

15 **A.**      Absolutely not.

16 **Q.**      Okay.  Fair enough.

17          With regard to his collection, then, you were

18 aware that he had subdivided -- particularly on one of the

19 exterior hard drives, that he had subdivided his collection

20 into various subfolders which were titles such as "virgins"

21 or "young" or "teen" or "rape" or "PTHC"?

22          Do you know what PTHC stands for?

23 **A.**      Of course.

24 **Q.**      What is that?

25 **A.**      Preteen hard core.

1  **Q.**     Is that a term that's commonly used by people that

2  search on the Internet, like Mr. McCarthy did, for child

3  pornography?

4  **A.**     It is.

5  **Q.**     And preteen would mean prepubescent perhaps?

6  **A.**     Probably.

7  **Q.**     Okay.  So despite your opinion that Mr. McCarthy

8  wasn't sexually excited by images of prepubescent children,

9  it's fair to say that he sure did maintain many thousands of

10  those images.

11  **A.**     Absolutely.  And, again, I would have made the same

12  assumption that I heard you make from viewing the images if

13  I hadn't done the Abel test and the polygraphs.  And I think

14  the issue here is that we don't always know the reasons why

15  people do what they do.  Sometimes it's the obvious reason,

16  but sometimes it's something else.

17            I will tell you that the majority of people that I

18  evaluate who collect child pornography, I do diagnose with

19  pedophilia, so -- including the ones that I testify about.

20  That is the most -- the researchers who have looked at this

21  in the treatment programs have found -- have said most

22  people who are looking and downloading child pornography are

23  pedophiles.

24  **Q.**     Okay.

25  **A.**     But there is a subgroup of them that aren't.  They're

1  either just compulsive or curious or weirded out or whatever

2  it is, other reasons.

3  **Q.**     Well, you described him, I think, on your direct

4  examination -- him being Mr. McCarthy -- as a hoarder or a

5  collector --

6  **A.**     Yes, sir.

7  **Q.**     -- but there was a method to his hoarding.  He

8  subdivided subfolders and put images of prepubescent

9  children in those subfolders and labeled those, correct?

10  **A.**     Yes.  I'm not arguing that at all.

11  **Q.**     Okay.  Let me move on.

12          You were talking about the -- the discovery that

13  you reviewed.  You didn't ever review the audio recording of

14  his statement to the police?

15  **A.**     No.

16  **Q.**     Okay.  Would that have been something --

17  **A.**     I've seen references to it.

18  **Q.**     Okay.  And to be fair, a lot of it's provided in the

19  PSI and the plea agreement, correct?

20  **A.**     Yes.  I mean, I do get it sometimes.  I just didn't

21  review it in this case.

22  **Q.**     Okay.  Do you know what software Mr. McCarthy used?

23  **A.**     It was mentioned -- someone mentioned it, but I --

24  I'm not personally familiar with it.  There's a surprisingly

25  large number of software that can be used for peer-to-peer

1  file sharing, so I can't remember the term, but I did hear

2  it.

3  **Q.**     Okay.  But you're not sure what it is now.

4  **A.**     Not to testify to, no.

5  **Q.**     Okay.  Now, you talked about the Abel Assessment

6  test, and you talked about generally what that is.  And I

7  had a question for you that was, where was that discussed in

8  your report, but now I see that you have updated your report

9  with --

10  **A.**     I apologize.  That was -- in my haste to get the

11  report out, I just missed that section.

12  **Q.**     No problem.  I think you were under time constraints.

13  You were just -- had about a week to prepare it.

14         You're aware that the Abel Assessment has been

15  declared inadmissible in courts, correct?

16  **A.**     There are times that it's been misused.  Sometimes

17  people use it to try to prove that a person isn't a child

18  molester or didn't commit a crime, and it's inappropriate

19  for that use.  It's only to be used as a measure for sexual

20  interest.  And I'm aware that it's been excluded sometimes,

21  and I'm aware that it's been included sometimes.

22         I've certainly been permitted to testify to the

23  results of the Abel in Florida federal courts at least --

24  more than 15 times, and this issue has been brought up most

25  of the time.

1  **Q.**    Well, since this is a sentencing, it's a little bit

2  more relaxed and so it wouldn't necessarily be excluded

3  here, but my question is, are you aware of some of the

4  problems that courts have found with this particular

5  assessment?

6  **A.**    I've read the findings, yes.

7  **Q.**    Okay.  Then you're -- have you read the case of

8  *United States versus Birdsbill*, which is a Ninth Circuit

9  case?  It's at 97 Fed. Appx. 721.  In that case the Court,

10 the Ninth Circuit, goes on to talk about how the fact that

11 the district court in the case found the test to be neither

12 relevant nor reliable in the circumstances because (1) the

13 test is a psychological instrument used for treatment, not

14 for diagnostic purposes; (2) Dr. Abel, the inventor of the

15 test -- and you know Gene Abel, right?

16 **A.**    Yes, sir, I do.

17 **Q.**    That Dr. Abel did not use a control group, and it's

18 unclear as to how the test ferrets out fakers, that is,

19 people who are giving fake good responses; No. 3, the test

20 has not been subject to adequate peer review because

21 Dr. Abel has the proprietary rights over the test and he's

22 not shared his findings or his protocol with other

23 scientists; and (4) --

24        MR. KHONSARI:  Judge, I'm going to object.  Is

25 there a question?  I believe the question was, is he

1  familiar with this case, and he hasn't had an opportunity to

2  answer that yet.  I believe now the government's just

3  arguing a case.

4           MR. BROWN:  Okay.  Point taken.

5  BY MR. BROWN:

6  **Q.**     Were you familiar with those objections that the

7  Ninth Circuit had?

8  **A.**     Yes.

9  **Q.**     Okay.  Were you familiar with -- or essentially the

10 other objections, that the potential error rate, quote,

11 varies from poor to appalling, closed quote, which makes it

12 unreliable?

13 **A.**     I've read that statement.  I don't agree with it,

14 but --

15 **Q.**     Okay.

16 **A.**     I don't agree with most of those statements, but --

17 and I don't think other experts in the field do either.  But

18 I will say that I did not come today prepared for a *David*

19 hearing, although I have testified in *Frye* hearings on

20 various instruments.  And I think part of the problem, in my

21 opinion, in the case you are mentioning is that either the

22 Court was misinformed or whoever was representing the side

23 of the Abel did not provide the correct information.

24           But I do know that there are issues and the

25 instrument is sometimes misused, as is the -- as are other

1  instruments, and so --

2  **Q.**     Well, what about the last objection that the Ninth

3  Circuit had -- or that the district court had and that the

4  Ninth Circuit recognized and that is the relevant scientific

5  community does not generally accept the AASI test as a

6  diagnostic test for pedophilia?  What about that one?  Do

7  you disagree or agree with that?

8  **A.**     Well, I disagree with that enormously.  In fact, you

9  know, when the Abel first came out, which was many years

10 ago, the dominant instrument was the penile plethysmograph,

11 p-l-e-t-h-y-s-m-o-g-r-a-p-h, and that was the instrument we

12 were all using.  But it turned out that that instrument

13 really was a poor one in terms of its reliability and

14 validity, and the Abel is much -- there's less to go wrong.

15 And over the years, we've just done tens of thousands of

16 tests where the data is compared to previous data.

17         Additionally, visual reaction time has become the

18 instrument of choice, and there are now replications of the

19 Abel.  There are other instruments that do essentially the

20 same thing, one produced in Canada and others rapidly coming

21 into the marketplace.  So this is the best that we have.  It

22 is not perfect, and it does have an error rate, just like

23 the polygraph that I also partly relied on also has an error

24 rate.

25 **Q.**     Okay.  So do you agree that your friend Dr. Gene Abel

1   refused to allow peer review of this particular test?

2   **A.**      He -- yeah, he did refuse to turn over some data.  He

3   turned over an enormous amount of data, and I know -- my

4   recollection at that time was that, you know, it was -- he

5   had patent issues.  He did -- he developed this instrument

6   to make money for himself as opposed to other research he

7   had done in the past, and he didn't want the instrument

8   duplicated easily.

9   **Q.**      Okay.  And so you're aware that that's the reason why

10  the Ninth Circuit, other courts, other scientific

11  individuals in the field have found it to be unreliable,

12  because it hasn't been peer reviewed.

13  **A.**      Yes.  I don't know that it hasn't been peer reviewed

14  today.  My belief is that it has undergone independent cross

15  validation and -- since then and that there's additional

16  literature in support of it.  But, again, I am not -- I

17  can't cite.  I've sat in the workshops where that data was

18  presented.  I have it in my office, but I didn't bring it

19  with me today.

20  **Q.**      Well, just to conclude on that topic, you admit that

21  it's not perfect, that it's subject to error, and you admit

22  that a substantial number of individuals/institutions

23  disagree with its reliability.

24          MR. DARKEN:  Objection, compound.

25          MR. KHONSARI:  Judge, I'd object to the compound

1  question.

2          THE COURT:  It's overruled.  Go ahead.

3  BY MR. BROWN:

4  **Q.**     You can answer it.

5  **A.**     I agree it has some error.  I think the objections to

6  it have dramatically decreased in the last couple years as

7  the field has moved in this direction.

8  **Q.**     Okay.  Thank you.

9          Now, the test that you gave --

10         THE COURT:  Hold on.  Let's take a ten-minute

11 break.

12         COURT SECURITY OFFICER:  All rise.

13         (Recess from 3:02 p.m. to 3:16 p.m.)

14         COURT SECURITY OFFICER:  All rise.  This Honorable

15 Court is now in session.

16         Please be seated.

17         THE COURT:  Let's proceed.

18 BY MR. BROWN:

19 **Q.**     Dr. Shaw, continuing with your testimony, with regard

20 to the tests that you've already provided direct testimony

21 about, is it fair to say that those tests are largely based

22 upon self reporting by the defendant?

23 **A.**     Psychological testing and --

24 **Q.**     Yes.

25 **A.**     Yes.

1  **Q.**     Okay.  So if a defendant were to lie or to leave

2  something out or to be untruthful, that may have a tendency

3  to make the test less -- the results of the test less

4  accurate?

5  **A.**     Yes, but these tests are -- I'm sure -- I didn't say

6  what they were, but they're the two most validated and cross

7  validated instruments available.  They both have lie scales

8  built into them.  They both can correct for any tendency.

9  Like in Mr. McCarthy's case, he tended to be not very

10 disclosive in general.

11 **Q.**     Well, let's talk about that for a second, the

12 tendency away from self disclosure.  The Millon Clinical

13 Multiaxial Inventory test, he displayed that tendency, that

14 is, to avoid self disclosure, correct?

15 **A.**     Correct.

16 **Q.**     Even though self disclosure would assist in your

17 analysis?

18 **A.**     Right.  Not just personality disorder --

19 **Q.**     All right.

20 **A.**     -- but cautious, mistrustful, paranoid in my

21 diagnosis, yes.

22 **Q.**     And in the MMPI, or the Minnesota Multiphasic

23 Personality Inventory II test, his responses also exhibited

24 a general unwillingness to disclose.  Is that fair?

25 **A.**     Absolutely.

1  **Q.**    Okay.  And in the polygraph testing that was done --

2  and I was looking actually in the -- in your report, pages 6

3  and 7.  I didn't see where you put in there his answers to

4  those questions.  Did I just miss that?

5  **A.**    He just answered no to all those questions.

6  **Q.**    Okay.  But that's not actually in there, is it?

7  **A.**    I thought it was -- let me see.

8  **Q.**    I mean, to be fair, I heard your testimony.

9  **A.**    I mean, if I didn't put it in there, it's pretty

10  stupid of me.  It would normally be in there.

11  **Q.**    Well, that may be a little harsh, sir, but I guess my

12  point is it's not in there.

13  **A.**    Right.

14  **Q.**    Your testimony's clear, but it's not in the report.

15  **A.**    Well, I appreciate you correcting me in that.

16  **Q.**    All right.  And there were two polygraphs on that

17  same day; is that right?

18  **A.**    I believe they were on the same day, yes.

19  **Q.**    Okay.  You weren't present, were you?

20  **A.**    No.  I'm not a polygraphist.

21  **Q.**    So you're relying on the information that was

22  provided to you by Mr. Jerald?

23  **A.**    That's correct.

24  **Q.**    Okay.  And those questions were on different

25  polygraphs.  Is that because there's only a certain number

1 of relevant issues that you can discuss during one

2 polygraph?

3 **A.**    You can only really discuss one relevant issue and

4 things that are closely related to it.

5 **Q.**    Okay.  And even though you're not a polygrapher, you

6 know -- you know that.

7 **A.**    And that's why we divided it up.

8 **Q.**    Okay.  And as long as we're on spelling errors, you

9 have written there polygraphist.  Shouldn't it be

10 polygrapher?

11 **A.**    Well, he refers to him as a polygraphist.

12 **Q.**    Oh, is that right?

13 **A.**    And let me just say that spell check considers it a

14 word as well.

15 **Q.**    Okay.  I stand corrected.  I'm sorry.

16         So with regard to the polygraph, you don't know

17 what type of polygraph it was?

18 **A.**    Yes, I do, sir.  This is a specific-issue or denial

19 polygraph.  It's the best polygraph -- Mr. Jerald -- let me

20 clarify.  The ITM Group has more than a thousand sex

21 offenders in treatment.  Every one of them has to get at

22 least one polygraph a year.

23         Mr. Jerald is our primary polygraphist or

24 polygrapher, does more than 500 polygraphs a year for us.

25 He's -- he was a Marion County sex crimes detective before

1  he became the supervisor for polygraphing and has been

2  polygraphing for many years.  And I consider him the most

3  reliable polygrapher in Florida, and that's why I prefer him

4  to be used when I do any cases.

5  **Q.**    Okay.

6  **A.**    But he's well known to me, and he's well known to, I

7  would say, the top polygraphers in Florida.

8  **Q.**    I'm not questioning his bona fides.  I'm just asking

9  if you knew what type of polygraph, and what I'm taking your

10  answer is this was a specific-issue polygraph?

11  **A.**    That's correct.

12  **Q.**    Referred to as a u-phase polygraph?

13  **A.**    What I've heard is a denial polygraph is the other

14  term.

15  **Q.**    Okay.  In fact, he did deny those five questions.

16  **A.**    Exactly.

17  **Q.**    Okay.  But he wasn't asked about being sexually

18  attracted to pubescent children, was he, or adolescent

19  children, was he?

20  **A.**    No.  He was asked these five questions --

21  **Q.**    Okay.

22  **A.**    -- and there are probably another hundred questions

23  maybe I could have thought up, but these were important

24  questions to me because of the issue of there's all this

25  prepubescent stuff and yet he says it wasn't sexual for him.

1  That's what I was interested in testing.

2  **Q.**    And I'm not trying to be cute.  I'm just trying to

3  make sure that the Court understands.

4        He wasn't asked about his sexual attraction to

5  pubescent children.

6  **A.**    To be honest, I think when he answered yes to being

7  attracted to some child porn, that's what he was talking

8  about, and he's acknowledged an attraction to postpubescent

9  girls and that he masturbated to some of that and --

10 **Q.**    I'm not asking you that, sir.  You said you weren't

11 there, so I'm not asking you --

12 **A.**    No.  I mean, he told me that, so why polygraph

13 somebody on if they're attracted to something when they

14 already admit that they are.

15 **Q.**    Okay.  And in your report you refer to that as

16 adolescent, not pubescent.

17 **A.**    I think I also refer to it as postpubescent in a

18 different place.

19 **Q.**    Okay.  And we've already talked a little bit about

20 this, I think, but let me just make sure I'm clear.

21       And the fact that he denies sexual excitement when

22 he viewed prepubescent child porn, that's a little at odds

23 with his statement in the plea agreement that he did it

24 for -- because the images were exciting.  Do you agree or

25 disagree with that?

1   **A.**     Well, again, you know, I don't know exactly which

2   images among all these images he was talking about.

3   **Q.**     Okay.

4   **A.**     He's acknowledging some of them were exciting, right.

5   **Q.**     Okay.  And you saw many, many prepubescent images of

6   child pornography when you viewed the images last week.

7   **A.**     Yes --

8   **Q.**     All right.

9   **A.**     -- absolutely.

10  **Q.**     Fair enough.

11          Now, you also, I think, testified as a defense

12  expert in the *Irey* case, I-r-e-y; is that right?

13  **A.**     I did.  That's correct.

14  **Q.**     And in that case you testified after examining the

15  defendant, and just to be fair so everybody knows, that was

16  a case, is it not, that involved the production of child

17  pornography and the sexual molestation of about 50 foreign

18  children?

19  **A.**     Right.  I don't believe the legal case involved the

20  molestation.  He was going to child brothels that were

21  supposedly legal over there.  I mean, they were managed by

22  the -- or moderated by the government.  But, yes, he

23  definitely was producing it and transmitting it, trading it

24  for value.

25  **Q.**     Right.  And although he wasn't charged, it was clear

1  that he had molested those children.

2  **A.**     Absolutely.

3  **Q.**     Okay.  And you found him, too, to be low in

4  psychopathy; is that right?

5  **A.**     He was low in psychopathy, yes.

6  **Q.**     And -- just like you found this defendant.

7  **A.**     Yes.

8  **Q.**     Okay.

9  **A.**     He was low in psychopathy also.  Now --

10  **Q.**     And --

11  **A.**     -- I don't remember a lot about that case, but I do

12  remember that he was, you know, a businessman, a family man,

13  a person who in most of his life was leading a regular life.

14  **Q.**     Have you read the published opinion in that case?

15  **A.**     I've read as much as I can slog through so far.

16  **Q.**     I'm sorry?

17  **A.**     It not easy for a psychologist to read legal

18  opinions --

19  **Q.**     I understand.

20  **A.**     -- and I've been working my way through it.

21          THE COURT:  Is that the case that has the 115-page

22  opinion?

23          MR. BROWN:  That's right.  I think it's --

24          THE WITNESS:  250 pages.  I have it at home, and

25  it's my evening reading, yes.

1  BY MR. BROWN:

2  **Q.**    Well, several of those pages are dedicated to you.

3  **A.**    I did see some of those.

4  **Q.**    In fact, it quotes you as saying, for example, that,

5  quote, "I think the availability of child images,

6  particularly on the Internet, has fueled an epidemic of

7  pedophilia that probably was kind of in the

8  background . . ." And that's, just for record purposes, 210

9  WL 2949465.  That's an Eleventh Circuit case.  That's at

10 page 8.

11         Do you remember reading that?

12 **A.**    I do, and I still agree with that.

13 **Q.**    Okay.  So in other words, your testimony, and I think

14 the Eleventh Circuit found that and the district court found

15 that, was that child pornography is a cause of child sexual

16 abuse.

17 **A.**    Well, no.  First of all, let's be clear.  Pedophilia

18 is a diagnosed disorder.  It is not a behavior.

19 **Q.**    Okay.

20 **A.**    So it is the -- so a person who is a pedophile has

21 sexual fantasies, urges, or behaviors that are associated

22 with sexuality of children.

23         So what I was saying was -- what I was trying to

24 say in that statement where I'm quoted is that there have

25 always been, I'm sure, people who had a latent interest in

1  children for whom there was really nothing to stimulate them

2  that wasn't aggressive and overt and that the availability

3  of child pornography, in my opinion, has created a medium

4  for them to satisfy and to actually inflame their interest

5  that wasn't there before.

6          And I said this in part because I've treated child

7  molesters, career child molesters, long before there was an

8  easy availability for child pornography, and those guys

9  would have given their right arm for child pornography, but

10  it wasn't -- it wasn't there.  So I was certainly saying

11  that, you know, probably people can have a latent interest

12  in things, but if they're not exposed to it, they don't

13  really know and that now with the Internet, more people are

14  being exposed to it.

15  **Q.**    Well, what I'm more interested in was the causal

16  connection that you made between child pornography and child

17  sexual abuse.  And the Court actually points that out on

18  page 41 saying, quote, "If child pornography is a cause of

19  child sexual abuse, as Dr. Shaw testified and the district

20  court found . . ." and then it goes on and makes some

21  comments.

22          So is that fair?  Was that your --

23  **A.**    No.  I think the Court misunderstood me, but, you

24  know, that happens sometimes.  When you testify not

25  everybody hears the same thing.  I don't believe that's what

1  I was saying.  But, you know, I haven't had a -- it's been

2  several years, I think, since I testified, and I have never

3  looked at a transcript of my testimony.  And I have to admit

4  that, you know, I try to be as succinct and clear as I can

5  be, but I'm sometimes misunderstood.

6          When I read that I was confused myself about the

7  conclusions that the Court drew, the appeals court drew,

8  from what I was saying.  I was certainly, like most people,

9  horrified by the explosion of child pornography, and -- but

10 I wasn't saying that it may have.  I was saying that it was

11 something that -- that you could have an interest and not

12 even know you have the interest, but here was a -- that if

13 you saw this and you found it interesting, you know, and

14 then you started looking at it, that it was just a -- it's a

15 bad thing, obviously.

16 Q.    So the district court -- just to make sure, the

17 district court, Judge Presnell, and the Eleventh Circuit

18 sitting en banc both misinterpreted your testimony?

19          MR. KHONSARI:  Judge, I'm going to object that

20 he's impeaching Dr. Shaw with a legal opinion rather than

21 the transcript of what Dr. Shaw's testimony was.  I don't --

22          THE COURT:  I'm going to sustain your objection.

23          MR. KHONSARI:  Thank you.

24 BY MR. BROWN:

25 Q.    You've testified, I think, that it's your opinion,

1  based upon these self-reported disclosures and the various

2  tests that we've been discussing, that the defendant's not a

3  pedophile.  Could you define the term pedophile?  And please

4  be brief.

5          THE COURT:  Well, I thought he just did that.

6  BY MR. BROWN:

7  **Q.**    All right.  Is that a person who's sexually attracted

8  to prepubescent children?

9  **A.**    Generally, yes.

10 **Q.**    Now, since Mr. McCarthy, in your opinion, is sexually

11 attracted to what you called the adolescent or postpubescent

12 children, would he be more properly classified as a

13 hebephile?

14 **A.**    No.  In my opinion hebephilia -- because it's normal

15 for adult heterosexual men to be attracted to adults and

16 adolescents, in my opinion only when a person is attracted

17 to adolescents to the exclusion of adults can they be

18 diagnosed as a hebephile.

19          I have diagnosed people with that.  I see them

20 quite often, but -- so I wouldn't diagnose him because

21 from -- from his -- he has an adult relationship.  He showed

22 attraction to adult females as a primary attraction on the

23 Abel.  So, no, I wouldn't use that diagnosis or I would have

24 put it in there.

25 **Q.**    Is it normal for an adult male to have such a massive

1  collection of prepubescent children being sexually abused?

2  **A.**      Obviously not, no, of course not.

3  **Q.**      And so your testimony would be that the defendant's

4  not normal.

5  **A.**      He's definitely an unusual person, yes.

6  **Q.**      Where does -- does the defendant rank in terms of his

7  collection, the volume of his collection, among the federal

8  defendants that you've been involved in examining?

9  **A.**      It's probably one of the larger collections.  I've

10  seen larger ones, but it's --

11  **Q.**      Okay.

12  **A.**      -- certainly one of the larger ones.

13  **Q.**      Okay.  And you indicated on direct examination that

14  the age groups of the prepubescent images and videos that

15  the defendant collected were infant all the way up to 12, I

16  think?

17  **A.**      That's what I saw.  I mean, there were some teens in

18  there too, but the predominant ones were probably 6 to 12

19  maybe.

20  **Q.**      Okay.  Were you also aware that the defendant had

21  images that -- on his computer of himself naked?

22  **A.**      I wasn't shown any of those.  I don't think I was

23  aware of that.

24  **Q.**      Well, you said you read the forensic report, the --

25  **A.**      I don't remember that.

1  **Q.**    All right.  Is that normal?

2  **A.**    I like to think it isn't, but in the Internet age a

3  lot of people say they do it, or a lot of people I know say

4  they've posted nude pictures or sexual images of themselves.

5  It seems weird to me, but people do it.

6  **Q.**    Okay.  Were you aware that Mr. McCarthy also

7  collected cartoon stories or representations of children

8  being sexually abused?

9  **A.**    I know he was into anime, and there's a lot of

10  child -- people -- children that look sexual or sexualized

11  children even in the commercial, legal anime, and I guess I

12  was aware that he had an interest in that.

13  **Q.**    Okay.

14  **A.**    There was some of that available to look at.

15  **Q.**    Okay.  Did you view any of that?

16  **A.**    A little bit of it, I did.

17  **Q.**    And in that -- in those particular -- many of those

18  slides were actually prepubescent boys being molested by

19  female adults.  Is that fair to say?

20  **A.**    Oh, I didn't look -- I didn't see any of that

21  specifically, but, you know, it -- it could be.

22  **Q.**    Okay.  Because you don't mention that anywhere --

23  **A.**    I mention --

24  **Q.**    -- in your report.

25  **A.**    -- the anime.

1  **Q.**      Okay.  All right.  And so anime --

2  **A.**      That's what I was referring to.

3  **Q.**      Okay.  I'm sorry.  Fair enough.

4  **A.**      My computer didn't have an accent for the E.

5  **Q.**      Okay.

6  **A.**      So it may not look like anime.

7  **Q.**      Okay.  You also indicate in your report -- let me

8  make sure I quote this right -- that, "No actuarials are

9  currently available to assess the recidivism risk of an

10 individual who views Internet child pornography."

11         Does that apply to also an individual like

12 Mr. McCarthy, who collects, downloads, and makes it

13 available for sharing on a file-sharing program?

14 **A.**      Right, the typical child porn possessor.  That's what

15 I meant.  There's no -- the research is too new.  The

16 actuarial risk assessment of contact sex offenders began in

17 about 1998, after decades of research of contact sex

18 offenders.  Research on Internet child pornography offenders

19 really started in the late '90s, so there isn't -- hasn't

20 been an accumulation of enough studies to be able to put

21 them together.

22         There are six or seven studies available

23 currently, and there's a new crop of studies about to be

24 published in the -- in an upcoming journal from the

25 Association for the Treatment of Sex Abusers, so I used

1  what's been published.  But there are no hard risk

2  assessments available.  Not only are they not available for

3  child porn viewers, they're not available for female sex

4  offenders, and they're not yet available for adolescent sex

5  offenders.  So the only group they're available for are

6  adult contact sex offenders.

7  **Q.**     So honestly, we don't know because there's no

8  actuarials that are available to assess --

9  **A.**     Well, we've been -- we have had theories and opinions

10 and have testified to -- and have based a lot of things on

11 estimated risk without actuarials.  I put that statement in

12 there to name that there is finally, for contact sex

13 offenders, a really hard way to estimate risk.  It's not

14 perfect, but it's a hard way.

15         Here we want to look at the research or the people

16 who have followed child porn viewers after they're released

17 to see how they do, what do they do.  Do they become child

18 molesters?

19 **Q.**     Sure.

20 **A.**     Do they look at child porn again?  And there are

21 studies now from England, from Canada, from Switzerland, and

22 from the United States that have recidivism data.

23 **Q.**     There are also studies that have found -- I think

24 Dr. Seto, who you actually cite.  Are you familiar with his

25 study wherein he concludes that child pornography offenses

1  are a valid diagnostic indicator for -- of pedophilia?

2  **A.**    Yeah.  That's not exactly what he said, but I -- I'm

3  very familiar with his study and --

4  **Q.**    Isn't that the title?

5  **A.**    Well, what he's saying -- what he's saying is --

6  **Q.**    Sir, isn't that the title of the article?

7  **A.**    Yes.

8          THE COURT:  Isn't what the title?  What --

9          THE WITNESS:  I'm not sure what the title is.  It

10  might be -- that might --

11          THE COURT:  What did you say the title was?

12          THE WITNESS:  I don't actually know what the title

13  is offhand.  I have the article here if you can't find it.

14  BY MR. BROWN:

15  **Q.**    Okay.  Seems like I've misplaced it.

16  **A.**    Yes.  It says Child Pornography Offenses are a

17  Diagnostic Indicator of Pedophilia.

18  **Q.**    Okay.  So that's the title.

19  **A.**    And I'm very familiar with the study.

20  **Q.**    Okay.  And do you agree with that?

21  **A.**    I -- I agree -- when you get into the study what you

22  find is that he compared a hundred child pornography

23  offenders --

24  **Q.**    Sir, you can testify about that after you answer the

25  question.

1  **A.**     I --

2  **Q.**     Do you agree with that statement?

3  **A.**     I somewhat agree with it.

4  **Q.**     Okay.  Fair enough.  If you'd like to explain.

5  **A.**     I'd like to explain.  First of all, Dr. Seto did not

6  use the definition of pedophilia.  He's a wonderful research

7  expert, and we're real close.  We're in subcommittees

8  together and have published together.

9          But in this particular study his definition of

10  pedophilia was based on the use of a certain type of penile

11  plethysmograph, and so he wasn't looking at the DSM-IV-TR

12  definition of pedophilia.  He was using arousal on the

13  certain type of plethysmograph that we don't use but they

14  use in research in Canada.  That's the first thing.

15          The second thing is that in his study of a hundred

16  child porn viewers, 39 -- 39 men were not pedophiles and 61

17  were.  So what he was saying is that it's a good indicator,

18  more than half were, and certainly I would want to say that

19  more than half of the men that I've evaluated for possession

20  of child pornography are diagnosed as pedophiles, so I don't

21  disagree in that sense.  I -- it makes sense.  It's hard to

22  understand why people would have it if they weren't

23  pedophiles.  It's the easiest explanation.

24          And so I do agree to -- with the exceptions that I

25  mentioned, that he wasn't using the actual definition that

1  we -- that I would use here in court and that, you know, it

2  was 61/39.  But certainly what he meant was also that he was

3  comparing it to men who molest children, and the reason

4  why -- so if you take the same hundred guys who molest

5  children, less of them are going to show an attraction to

6  images of children when measured on the plethysmograph than

7  they would if they were people who looked at child porn.

8          So in his discussion section, one possible reason

9  is that people who look at child porn are turned on to

10 pictures, and people who molest kids are turned on to the

11 real thing and pictures don't turn them on as much.  Another

12 possible explanation is that the most common contact sex

13 offender is an incest offender who molests a daughter

14 between the ages of 8 and 14, and they're almost never

15 pedophiles.  So a vast majority of the most common sex

16 offender isn't a pedophile.

17         So with those things said, you know, it's a great

18 study, and I think the most obvious explanation for looking

19 at child porn is attraction to children.  I agree with that.

20 Q.    Okay.  You indicated on direct examination a

21 statement that because the defendant reported to you, self

22 reported to you, that he did not buy child pornography, or

23 at least in the polygraph he indicated that, that somehow he

24 was not supporting the demand for child pornography.  Is

25 that really what you said?

1  **A.**     The industry, the paid industry.  That's my -- that's
2  my opinion, and I don't -- you know, I -- it doesn't mean
3  that I think it's okay by any means.  It simply means that I
4  think people who engage in peer-to-peer file sharing are not
5  fueling the industry.
6          They're doing something different.  It's not that
7  they're doing something good, but it's -- I think the people
8  that produce it and the people who sell it and the people
9  who pay for it are the -- that's a -- in my opinion, having
10 a more direct impact on the industry.
11 **Q.**     Okay.  You're aware that Congress has issued factual
12 findings to the contrary.
13 **A.**     I'm aware of the -- some of the explanations for,
14 like, the sentencing guidelines.  Is that what you mean?
15 **Q.**     No.  I was actually talking about the factual
16 findings in the enactment of child pornography laws.
17 Congress has made certain factual findings.  For example,
18 every instance of viewing an image or video of child
19 pornography redamages, if you will, the child --
20 **A.**     Well --
21 **Q.**     -- and drives the industry.
22 **A.**     Right.  I wouldn't -- all right.  I think that -- you
23 know, certainly when the children are victimized -- you
24 know, I've spent my whole career working with men and women
25 who victimize children, and about 40 percent of them were

1 victims themselves.  I've done a lot of work with victims.

2           And certainly sexual abuse is a horrific form of

3 victimization that has lifelong consequences.

4 Perpetualizing it through pictures, in my opinion, makes it

5 worse.  Certainly knowing that people are looking at it

6 could add to somebody's pain and anguish, and I have no

7 doubt about that.

8 **Q.**    So you don't disagree with --

9 **A.**    I don't disagree with that part.  I disagree with the

10 industry part, so I -- to be honest, I don't always agree

11 with Congress.

12 **Q.**    Well, I'm sure there are a lot of people that don't,

13 but let's not open that can of worms.  Thank you.  I

14 appreciate your answer.

15           In your opinion after whatever term -- prison term

16 that the defendant receives in this case, do you believe

17 that it would be safe for a -- for the defendant to be

18 around -- to be able to have what people would say is normal

19 contact with children, that is, to baby-sit children for

20 neighbors, to volunteer with the Girl Scouts, to volunteer

21 at summer camp, or to be in a place where children are

22 present?  Would you feel comfortable with that,

23 hypothetically?

24 **A.**    Based on the research and based on my evaluation of

25 him, I would if that had been something -- like, for

1 example, if he were a parent and he had kids, and he was

2 going to do something with the kids.  I doubt that he would

3 want to do that.

4        But, yes, there's no evidence that he's ever

5 molested children, and there's no reason to believe that

6 he's going to molest children because the link between

7 viewing child pornography and molesting children is not

8 being made.  The research is not supporting that.

9        And I -- and -- I mean, I'm exploring the link

10 between viewing child pornography without getting caught and

11 whether that might ultimately lead to child molesting for

12 some people.  But I'm sure you'll agree Mr. McCarthy has

13 experienced some pretty negative consequences for

14 downloading and saving material on his computer and is

15 likely going to be supervised for quite some time and go

16 through treatment and have, you know, a number of years in

17 prison.

18        So those are deterrents.  Particularly, you know,

19 for middle-class individuals being -- going through the

20 humiliation of arrest, conviction, sentencing, going through

21 prison, it's a tremendous deterrent.

22        Until the get-tough-on-crime movement of the

23 mid '80s, we all knew that -- first-time offenders always

24 got very low sentences because we knew that most people who

25 were not career criminals and who get in trouble don't do it

1  again.  But now we give very long sentences even to

2  first-time offenders, and, you know, that's how it is.

3  **Q.**     So is it your testimony that you would feel

4  comfortable having an individual that had one of the most

5  massive child pornography collections that you've dealt with

6  in federal court at least baby-sit a child alone?

7  **A.**     A person who is not inclined to suffer from

8  pedophilia -- let's say this.

9  **Q.**     Yes or no?

10 **A.**     I don't think I'd want him around my young teenage

11 daughter, but I think -- I don't think he -- he would be --

12 I don't think he's really a danger to children.

13 **Q.**     So in your opinion he presents a danger to young

14 teenage females but not to prepubescent children?

15 **A.**     If he presents any danger at all, that would be the

16 group.

17 **Q.**     And you wouldn't want him around your teenage

18 daughter.

19 **A.**     You know what?  I don't -- personally when we treat

20 people who have had any kind of a problem --

21 **Q.**     Can you just answer that question yes or no?

22 **A.**     It's hypothetical.  I don't know the answer.

23 **Q.**     Fair enough.

24           MR. BROWN:  No further questions.

25           THE COURT:  Anything else?

1          MR. KHONSARI:  Briefly, Judge.

2                    REDIRECT EXAMINATION

3  BY MR. KHONSARI:

4  **Q.**     Dr. Shaw, Mr. Brown spent a great deal

5  differentiating between postpubescent and adolescent.  Were

6  those terms synonymous in your report?

7  **A.**     I intended them to be.

8  **Q.**     Okay.  Why do you use the Abel test, Dr. Shaw?

9  **A.**     I use it to challenge the routine minimization and

10  denial that I get from clients who appear to be potentially

11  interested in children and/or to just rule it out.

12          So I use it even with men who are, for instance,

13  charged with chatting with a -- what they thought was a

14  14-year-old on the Internet.  I use it to see is there

15  any -- what is their sexual interest?  Does it go beyond the

16  age and sex of the person that they were chatting with, or

17  what parts of the images that they had on their drive were

18  sexually interesting?

19  **Q.**     What have been the results of your most recent Abel

20  test that you've performed?

21  **A.**     On the last three cases, two of them clearly came out

22  as pedophiles being attracted to prepubescent children and

23  different -- one of them the same as what he acknowledged

24  and one other than what he acknowledged.

25  **Q.**     Dr. Shaw -- go ahead.

1  **A.**     And then this test.

2  **Q.**     Okay.  Dr. Shaw, Mr. Brown, I believe on four or five

3  occasions on his cross-examination, kept reporting -- or

4  kept referring to self-reported disclosure.

5          Were all the tests and evaluations that you had on

6  Mr. McCarthy self reported, involving only Mr. McCarthy

7  giving you self reporting of information?

8  **A.**     No.

9  **Q.**     Okay.  What did you use that did not involve

10 self-reported disclosure?

11 **A.**     The Abel is an objective measure of sexual interest.

12 You know, polygraphs are a test of disclosure, and actually

13 the psychological tests, although they are disclosures, are

14 corrective for any tendencies to lie or fake good.

15          MR. KHONSARI:  I have no further questions for

16 Dr. Shaw.

17          THE COURT:  Thank you, sir.  You may step down.

18          THE WITNESS:  Thank you.

19          THE COURT:  You can step down.  Thank you, sir.

20          Call your next witness.

21          MR. KHONSARI:  Your Honor, at this time -- that

22 would conclude testimony, Judge.  We do have some family

23 members that would like to give statements and then --

24          THE COURT:  Let's do that now then.

25          MR. KHONSARI:  Judge, the defense would call

1  Robert Taylor to the podium.

2              Sir, could you please introduce yourself?

3              MR. TAYLOR:  Your Honor, my name's Robert Taylor.

4  I'm here today on behalf of my close friend.

5              THE COURT:  Yes, sir.

6              MR. TAYLOR:  Additionally I'm here to represent my

7  family, my wife of 15 years and my daughter of 11 years.  In

8  our household we know the defendant, Mr. McCarthy, as Bill

9  or Uncle Bill.  Last night we moved some furniture from his

10 home, and I heard my daughter, you know, refer to Uncle Bill

11 when she was talking to her friends, my 11-year-old

12 daughter, who -- I trust him with my daughter.  He would

13 actually be a caretaker if something happened to us.  He was

14 on my will, or is on my will.  My wife felt that she'd be

15 too emotional to be here to help out.

16             THE COURT:  You tell her that you got emotional

17 too.

18             MR. TAYLOR:  I know.  It would mess me up even

19 worse if I saw her.  My wife felt -- like I said, Bill's a

20 friend.  He's always been there for me at all times in any

21 situation so that's why I'm here for him today, Your Honor.

22             I graduated with an engineering degree from

23 Virginia Tech in 1988.  I moved to Florida.  My first

24 professional job was manufacturing engineer for three years

25 from '89 to '92.  Since '92 I've been working for a large

1  health care insurance company here in Jacksonville, and

2  that's where I met Bill in 1993.  Bill was the lead system

3  designer who was a contracted vendor based out of Orlando.

4  He was living with his sister and nephew.

5          Bill and I completed many successful information

6  technology projects with highly successful results.  Bill

7  was my mentor, ensuring knowledge transfer and helped me

8  with my professional development.  I'm an old jock and

9  he's -- he was always kind of keeping me in check, you know,

10 being politically correct because I was a pretty young buck

11 in the corporate environment.

12         Bill would stay in Jacksonville for the workweek

13 and then return to Orlando on weekends where he lived with

14 his sister and nephew.  He always spoke highly of his

15 sister, sister's family, and especially his nephew, who was

16 in high school at the time.  Over the years as a project

17 team member -- well, we worked together from '93 to '98, so

18 that was a long span of years with probably four- to

19 six-month-term projects.

20         Over the years, the project team at my company, we

21 became close friends.  We'd always go out and play tennis at

22 various facilities around town, and then we'd round up

23 friends and family members and played doubles so we'd have

24 women and their daughters playing and whatnot.  Never

25 partied.  I guess we're past the partying days, drinking and

1  whatnot.

2         But Bill's expertise -- let me shift gears because

3  Bill's expertise and willingness to voluntarily help others

4  had us -- me as a liaison -- helping friends, pastors, and

5  neighbors fixing computer problems requiring a lot of time

6  sometimes, and I'd just be there as a liaison.

7         One time -- I'm from southeastern Virginia, and

8  Bill was traveling to Boston where he's from, and he

9  actually came out to my mother's house.  My mother invited

10  him; she'd visited down here, and we went to my mother's

11  house and installed ceiling fans in her house.  He simply

12  has a servant's heart, Your Honor.

13         I know Bill did -- what he did was a serious

14  transgression and not to be excused.  As a parent of a

15  precious young girl, Your Honor, I can very much appreciate

16  the harm this type of thing does.  However, I can tell you

17  that in all the time that I've been around Bill, my family

18  and particularly my daughter, has been nothing but

19  appropriate -- he's been nothing but appropriate.  Even

20  though what he does does not determine my belief that he is

21  truly not a threat or danger to society, I know that Bill

22  feels great remorse over what he allowed to happen and would

23  do anything to change the circumstances.

24         I know he accepts the consequences of his actions.

25  As I understand, Your Honor, he stepped up and took

1 responsibility for what he did by pleading guilty and even

2 voluntarily forfeiting his home, which will leave him to

3 start over after whatever term of imprisonment you decide,

4 Your Honor.

5          Bill is literally the most well-rounded, smartest,

6 and dependable friend I've ever had and is a man with a

7 dignified and decent character.  I respectfully ask Your

8 Honor to temper justice with mercy and consider this one bad

9 act against a lifetime of good and return him to his

10 soulmate, Tammy, and his family as soon as possible so he

11 can rebuild his life.

12          Thank you for your time and consideration, and God

13 bless everyone.

14          THE COURT:  Thank you.

15          MR. KHONSARI:  Maureen Hunt.

16          Ma'am, if you could introduce yourself to the

17 Court.

18          MS. HUNT:  Good afternoon.  My name is Maureen

19 Hunt, and I'm Bill McCarthy's sister.  Thank you for letting

20 me say a few words on his behalf.

21          Your Honor, Bill and I were just 14 and 15 years

22 old when we lost our mother.  Our father had died just two

23 years before, and we were eventually separated into

24 different homes.  We never received counseling and were left

25 to grow up without their guidance.  In spite of the

1  situation Bill continued to be a protective and supportive

2  big brother and managed to make his own path in life.

3          When I went to college, Bill, who was just a year

4  ahead of me, enlisted in the Air Force, and after high

5  school he served for four years, becoming a sergeant.  He

6  also spent time in the reserves.  In 1979 I moved to

7  Orlando, Florida, and started work at Walt Disney World,

8  where I have worked for the past 30 years.  Bill moved down

9  to Florida in 1990 and moved in with me, my ex-husband, and

10  my son, who was eight at the time.

11          We lived together as a family for about ten years.

12  Never during that time was Bill anything less than a great

13  brother and a role model for my son.  He helped support my

14  son in both school functions and sports and was active in

15  taking care of him for me.  Never during that entire time

16  did Bill ever say anything inappropriate to myself, my son,

17  his friends.  And Brian is here today.  He'll talk to you in

18  a minute, tell you about his uncle.  Bill was very generous

19  to us.  He built us a huge pool and a deck for all of us to

20  enjoy.

21          After my divorce Bill stayed with my son and

22  myself and supported us emotionally and financially for

23  several years later.  During my divorce Bill gave me the

24  money to buy out my ex-husband's equity in our home so that

25  my son and I could keep our home.

1          Your Honor, my brother, Bill, has a warm and

2   caring heart and would give you the shirt off his back if

3   you were in need.  I know what he did is gravely serious,

4   and I believe that Bill is very ashamed and regretful that

5   his actions have hurt others.

6          Your Honor, in sentencing my brother, I

7   respectfully ask that you please take into consideration the

8   fact that except for this undeniably awful offense, my

9   brother has lived a very honorable and decent life and ask

10  that he be allowed to pay his debt and return to us as

11  quickly as possible.

12          Thank you.

13          THE COURT:  Thank you.

14          MR. KHONSARI:  Brian Fippinger.

15          MR. FIPPINGER:  My name's Brian Fippinger.  I'm --

16          THE COURT:  Brian, would you say your last name

17  again?

18          MR. FIPPINGER:  Fippinger.

19          THE COURT:  Would you spell that for me?

20          MR. FIPPINGER:  Yes, sir.  It's F-i-p-p-i-n-g-e-r.

21          THE COURT:  Thank you.

22          MR. FIPPINGER:  And I'm Uncle Bill's nephew.  I'm

23  here before you to speak on his behalf.  I know that my

24  uncle has pled guilty to a very serious crime.

25          THE COURT:  How old are you, Brian?

1           MR. FIPPINGER:  I am 26 years old, Your Honor.

2  I'm 26.

3           However, I hope that when deciding his fate,

4  you'll consider what I have to say.  I was eight years old

5  when my uncle came to live with me and my parents in

6  Orlando.  He lived with us for about ten years, and I can

7  honestly say that he is an awesome uncle and had a very

8  strong positive influence on me.

9           In October of 2009 I returned from a tour of duty

10  in Iraq.  Seven months later, on May 17th, 2010, I was

11  honorably discharged from the Army National Guard after

12  eight years of active service.  Through the training I

13  received in the Army, I'm a certified air traffic

14  controller.  This coming January I'll go back to school and

15  finish my college degree.

16           My uncle, along with my parents, was adamant on me

17  attending the best schools possible to get a good education.

18  Because of my uncle's concern and financial generosity, I

19  was able to attend private schools.  I believe that having

20  such a good primary education allowed me to excel in the

21  military.  And part of my decision to join the military was

22  the influence of the example my uncle set for me, being a

23  veteran himself and having benefited from the discipline,

24  education, and training he received in the military.

25           My uncle had a huge part in developing my

1    interests, particularly in technology.  I have fond memories

2    of playing flight simulator games with him and my

3    stepfather.  My uncle networked our computers so we could

4    all play together.

5         When my parents were working or out of town, he

6    would watch me so we would often spend time together.  I

7    remember one time when my parents went to Las Vegas and he

8    watched me for five days.  We had such a great time.  My

9    uncle took me to soccer practice, the batting cages, and

10   picked me up from school.  When I had friends over, he would

11   do fun stuff with us.

12        He was a great teacher and always had a cheerful

13   attitude.  He taught me about computers and how to do basic

14   mechanics on cars.  I would like you, Your Honor, to know

15   that in all the years my uncle was around me and took care

16   of me, he was completely appropriate and never did anything

17   but to protect.  I also know that he was frequently around

18   my friends, and I never saw my uncle act in any way that was

19   not completely appropriate with any of them either.

20        During the years my uncle lived with us, I

21   remember having conversations with my mother about adults

22   being inappropriate with children.  At the time when many of

23   the allegations of abuse by priests were surfacing, I was

24   attending Catholic schools.  She was very concerned about my

25   safety and wanted to make sure I knew what to do if anyone

1  did anything to me.  I am confident that had my uncle done

2  anything to me or my friends that was not appropriate, I

3  would have told my parents.

4          I am grateful to my uncle for everything he did to

5  help me and my mom, and I regret seeing him in this

6  position.  I would simply ask that you please take into

7  consideration the qualities and nature of a man who was

8  capable of such kind and generous acts.  I know that my

9  uncle regrets his actions and hope that he's allowed to

10 return to his friends and family as soon as possible.

11         Thank you.

12         THE COURT:  Thank you.

13         MR. KHONSARI:  Lastly, Your Honor, Tammy Sparks.

14         MS. SPARKS:  Your Honor, I'm Tammy Sparks.  Excuse

15 me.  I want to thank you in allowing me to speak on Bill's

16 behalf.  I've known Bill for ten years and the last

17 two-and-a-half years I've been his girlfriend.  I believe us

18 to have a very warm and caring and healthy relationship.

19 I've grown to love Bill very much.

20         Ever since I've known Bill, he has been kind to

21 others, always on hand to help somebody, and has shown me

22 how people should be.  His kindness and willingness to help

23 others and give from the heart and never ask for anything

24 back is the man before you.

25         Bill lost his parents, both his parents, while

1 still a boy, and in spite of this adversity, Bill managed to

2 become a good, upstanding citizen.  Bill enlisted in the Air

3 Force, served his country honorably.  From there he went out

4 into the world without any special advantages except for his

5 smarts and his work ethics.  He went to work, paid his

6 bills, bought a home, and lived a quiet, peaceful life.

7 Bill has never been in trouble with the law until now, and I

8 know he's very remorseful, and I know that he did something

9 very seriously.

10          My hope to you today, Your Honor, is that you see

11 the man before you as the man he is, a decent, a good

12 person, who made a terrible and tragic mistake, and hope

13 you -- and hope you see someone who is truly sorry and

14 regrets what he has done.

15          I ask you to please consider a lifetime that Bill

16 has spent doing the right thing, being a decent man he is,

17 and see that he is someone who is both capable of learning

18 from his severe mistake and someone who's deserving a degree

19 of mercy.

20          I thank you for considering my words and

21 respectfully ask that you -- Bill be allowed to return to

22 his family and friends as soon as possible.

23          Thank you.

24          THE COURT:  Thank you, ma'am.

25          MR. DARKEN:  Your Honor, what we have left is

1    legal argument, which I'm going to take care of.  We filed

2    the sentencing memorandum, and Mr. Brown responded recently.

3          In the memorandum that we filed, we cited 20

4    district court cases, including one from Judge James

5    Lawrence King in the Southern District of Florida and Judge

6    Presnell from Orlando, in which district courts have varied

7    from the 2G2.2 guideline within the last two or three years

8    based on their conclusions that the guideline was not based

9    on empirical data or the sentencing expertise of the

10   commission, and we provided that -- excerpts of that -- from

11   those cases to the Court.

12         The government responded in their sentencing

13   memorandum on page -- I believe it's page 2 of their

14   memorandum.  They basically said that that argument was

15   barred by the Eleventh Circuit's decision in *United States*

16   *versus Pugh*, so basically saying, you know, "Don't worry

17   about those 20 cases from around the country because *Pugh*

18   means that that argument is -- we can't succeed with that

19   argument."

20         Now, what I did was -- they also cited on the next

21   page, on page 3, the *Irey* case, which was discussed somewhat

22   in the testimony of Dr. Shaw, and that's the big case the

23   Court referred to, the 134-page opinion, whatever.  So I

24   went and read *Irey*, and I want to present the Court with --

25   I presented it to Mr. Brown already -- with just some of the

1  pages from *Irey* to make only a few points.

2          I was looking at *Irey* to see whether the

3  government was right that my argument was barred by *Pugh*,

4  and I don't think it was.  Here's why.  I direct the Court's

5  attention to page 111, footnote 32 of the *Irey* opinion, and

6  that's where the *Irey* court, the en banc Eleventh Circuit,

7  characterized what it meant -- what the panel meant in *Pugh*.

8          Here's what the *Irey* court en banc majority said:

9  "In *Pugh*, we rejected the notion that *Kimbrough*-style policy

10 disagreement could justify the district court's decision to

11 impose a probation-only sentence in a child pornography case

12 where the minimum guideline sentence was 97 months."  That's

13 what happened in *Pugh*.  Those were the facts of *Pugh*.  The

14 Eleventh Circuit said, "You can't go from 97 months to

15 zero."  That was the holding of *Pugh*.

16          But look at the bottom two sentences of that

17 footnote.  The Eleventh Circuit *Irey* en banc majority says,

18 "We do not rule out the possibility that a sentencing court

19 could ever make a reasoned case for disagreeing with the

20 policy judgments behind the child pornography guidelines.

21 We hold simply that in this case" -- and I'll talk about

22 *Irey* in a minute -- "involving production of child

23 pornography, as in *Pugh* involving possession of child

24 pornography, the district court did not come close to doing

25 so."

1          All they're saying is that in the *Pugh* case, the

2   district court erred by going from 97 months down to zero

3   and that in *Irey*, which we sort of talked around -- in *Irey*

4   the defendant went to China.  He worked as a businessman in

5   China.  He took side trips to Cambodia.  He raped more than

6   50 individual little girls.  He filmed himself raping them,

7   then he put that stuff --

8          THE COURT:  Well, I have not really finished

9   reading that case, but the factual situation in that case

10  does present some of the worst facts that I've seen.

11         MR. DARKEN:  That's my point.  That's what I'm

12  saying, Your Honor.  And that's all they're saying in the

13  footnote here is that in *Irey* the district court didn't make

14  a reasoned case for disagreeing with the policy judgments

15  behind 2G2.2.

16         THE COURT:  And when I say the facts in that case,

17  I mean the facts recited by the Eleventh Circuit in that

18  case.  Apparently, I think the doctor, Dr. Shaw, may have

19  some problems with some of the findings about what occurred.

20         MR. DARKEN:  Well, I'm just talking about the

21  facts as recited by the Eleventh Circuit en banc majority

22  that I read.

23         THE COURT:  Yeah.

24         MR. DARKEN:  I'm just making the point that I

25  don't think you can read the last two sentences of footnote

1  32 in *Irey* and come to the conclusion that you can't even

2  think about the 20 cases I gave you because *Pugh* says that

3  argument's barred.  I don't think that's correct.

4          In fact, on the next page, page 112, the Eleventh

5  Circuit says it plainly, almost about two-thirds of the way

6  down.  It says, "Without qualifying, *Kimbrough* allows a

7  district court to vary from the guidelines based solely on

8  its judgment that the policies behind the guidelines are

9  wrong."  It doesn't say are wrong in crack cocaine cases.

10  It doesn't say are wrong concerning the crack cocaine

11  guidelines.  It just says that you have the freedom, under

12  the advisory guideline system, to make a reasoned

13  determination under the facts of a particular case with a

14  particular defendant that a particular guideline -- that you

15  disagree with the policy judgments behind that guideline.

16          So our position is you are free to consider the

17  arguments made and accepted in the 20 district court cases

18  that we cited where judges have varied based on their

19  position that 2G2.2 was not enacted pursuant to the

20  Sentencing Commission's characteristic institutional role.

21  It was not based on empirical data.

22          And the proof of that I'm going to get to is best

23  cited in the very recent case, Second Circuit case -- may I

24  approach, Your Honor?

25          THE COURT:  Yes.

1          MR. DARKEN:  We cited this case, but I want to

2   provide the Court with a copy because I want to make a few

3   points.  This is from May of this year, May of 2010, Second

4   Circuit case, *United States versus Dorvee*.  This is the

5   first court of appeals that I know of that has followed the

6   20 or so district courts around the country in concluding

7   that the policy judgments behind 2G2.2 are so weak that it's

8   not worthy of the normal deference given to guidelines.

9          THE COURT:  Well, when you talk about policy

10  judgment, specifically what policy judgments are we talking

11  about?

12         MR. DARKEN:  Well, that's what I'm -- that's a

13  great question, Your Honor.  What I'm getting to -- and I'll

14  just work from the *Dorvee* case which I've highlighted.  I

15  gave it to Mr. Brown.  He's got the same highlighting so

16  we're all working off the same issues.

17         What the Second Circuit said -- they basically

18  make two points.  They said by looking at the way the

19  enhancements work, it comes out to exactly like in this

20  case, and I'm looking at what's page 96.  Starts off, "The

21  2G2.2 sentencing enhancements cobbled together through this

22  process routinely result in guidelines projections near or

23  exceeding the statutory maximum even in run-of-the-mill

24  cases."

25         Then it talks about the base offense level.  It

1   says, "The base offense level for distribution of child

2   pornography, which in 1991 was 13, has gradually been

3   increased as the commission has attempted to square the

4   guidelines with Congress's various directives."

5         And then it goes through the enhancements, which

6   are why we're at the guidelines level we're at.  It says,

7   "On top of that, many of the 2G2.2 enhancements apply in

8   nearly all cases.  Of all sentences in 2G2.2 in 2009, 94.8

9   percent involved an image of a prepubescent minor,

10  qualifying for a two-level increase."  That's happened in

11  this case.  "97.2 percent involved a computer, qualifying

12  for a two-level increase."  That's in this case.  "73.4

13  percent involved an image depicting sadistic or masochistic

14  conduct."  That's in this case.  "And 63.1 percent involved

15  600 or more images, qualifying for a five-level increase."

16  That's in this case.

17        So what they're saying is, in sum, these

18  enhancements, which apply to the vast majority of defendants

19  sentenced under 2G2.2, add up to 13 levels, resulting in a

20  typical total offense level of 35.  That's our case.  And

21  then -- then they go down to it and they look at how that

22  applies and where it pushes people up against the statutory

23  maximum.

24        And the Second Circuit -- this isn't me, this is

25  the Second Circuit Court of Appeals saying, "An ordinary

1  first-time offender is therefore likely to qualify for a

2  sentence of at least 168 to 210 months, rapidly approaching

3  the statutory maximum, based solely on sentencing

4  enhancements that are all but inherent to the crime of

5  conviction."

6          And then further down --

7          THE COURT:  Well, I'm not sure that they're

8  inherent in the crime, but they do seem to be consistently

9  present in all of the crimes.

10          MR. DARKEN:  I mean, I agree that it's

11  theoretically possible you can look at one image, commit

12  this crime, and not have the -- not have the number of

13  images enhancement apply.  You can look at an image and not

14  have the --

15          THE COURT:  It's rare.

16          MR. DARKEN:  Correct.

17          THE COURT:  Yeah.

18          MR. DARKEN:  Correct.  In the reality -- the

19  statistics that the Second Circuit cited comes from the

20  Sentencing Commission from 2009, so that's the reality of

21  the situation.

22          THE COURT:  I think in every case that I've had,

23  there's been a two-level increase for prepubescent children.

24  There's been a two-level increase for -- the one that really

25  gets me is the computer.  Every case that I've ever had in

1  30 years involved -- in 16 years on this bench has involved

2  a computer.

3          MR. DARKEN:  Well, what the Second Circuit says --

4  this is --

5          THE COURT:  And I think based on the definition

6  under the Eleventh Circuit these days, every case also is a

7  sadistic or masochistic -- involves sadistic or masochistic

8  conduct.

9          MR. DARKEN:  Well, what -- the Second Circuit

10 makes a point on the page before that that even the

11 Sentencing Commission criticized the two-level computer

12 enhancement because they said that same point, they all

13 involve computers, but the Sentencing Commission was forced

14 to do that by Congress.  In footnote --

15         THE COURT:  Congress does have that authority,

16 doesn't it?

17         MR. DARKEN:  Well, here's the -- I think the

18 answer to that is no, Your Honor.  Congress has the

19 authority to raise -- Congress has the authority to impose

20 the five-year mandatory minimum, which Mr. McCarthy faces.

21 You're going to have to sentence him to at least five years.

22 He knows that; we know that; your hands are tied.  Congress

23 can set a statutory minimum.

24         But Congress is not supposed to set guidelines.

25 It's the purpose -- the whole purpose of the guidelines

1   commission was to set guidelines based on empirical data in

2   a nonpolitical way, in a scientific way.  And what footnote

3   6 of this opinion does, in one footnote, is list exactly the

4   amendments to the guidelines which were done and then cites

5   back to the congressional acts that required Congress to go

6   up -- the commission to go up, up, up, up, and it pushes

7   everyone to -- the typical offender to near the statutory

8   maximum, and then you come down from that based on pleading,

9   and you end up where we are.

10          And our point is simply that that doesn't make

11  sense, and it's not based on empirical data.  And the Second

12  Circuit, at the end of the opinion, ends up saying -- it's

13  just like *Kimbrough*.  The Second Circuit says, "In keeping

14  with these principles in *Kimbrough*, the Supreme Court held

15  it was not an abuse of discretion for a district court to

16  conclude that the guidelines treatment of crack cocaine

17  convictions typically yield a sentence greater than

18  necessary to achieve the goals of 3553(a) because those

19  particular guidelines, quote, do not exemplify the

20  commission's exercise of its characteristic institutional

21  role."  Then the circuit says, "As we have explained here,

22  the same is true for the child pornography enhancements

23  found at 2G2.2."  That's our argument.

24          Now, independent of that, independent of that, I

25  want you to look at the last excerpt of *Irey*, page 124.

1  Suppose I'm wrong.  Suppose you say, "Well, I don't agree

2  with you.  I don't think I can vary based on my policy

3  disagreements, if any, with the guidelines."  Well, here in

4  *Irey* -- this was decided on July 29th.  It's very recent.

5  This is the latest Eleventh Circuit opinion that I've read.

6         THE COURT:  Which page are you --

7         MR. DARKEN:  Page 124.  It's the last of the

8  three-page excerpt that I gave the Court.

9         THE COURT:  Okay.  I'm assuming this is . . .

10         MR. DARKEN:  I've got another copy.

11         THE COURT:  Go ahead, Counsel.  I've got so much

12  stuff up here.  I think I have it, yeah.

13         MR. DARKEN:  Okay.  It starts this way:  "We have

14  not attempted to specify any particular weight that should

15  be given to the guidelines range and will not now.  Our best

16  discussion of the subject came in *United States versus*

17  *Hunt*," and they have the cite there, "where we rejected any

18  across-the-board proscription regarding the appropriate

19  deference to give the guidelines.  We decided instead that

20  subject to review for reasonableness, sentencing courts may,

21  quote, determine on a case-by-case basis the weight to give

22  the guidelines so long as that determination is made with

23  reference to the remaining 3553(a) factors that the Court

24  must also consider in calculating the defendant's sentence."

25         So even if I'm wrong about my argument that you're

1  entitled to have a policy disagreement with 2G2.2 and to

2  vary based on that, even if I'm wrong about that, you still

3  have to decide for this defendant, in this case, on these

4  facts, the appropriate weight to give to the guidelines.

5  And it's our position, for the reasons that we articulated

6  in the sentencing memorandum, which I will just sum up

7  briefly, that when you look at all the 3553 factors,

8  including the guidelines but not dominated by the

9  guidelines, that the appropriate sentence is the five-year

10 mandatory minimum sentence.

11        We know the nature and circumstances of the crimes

12 are serious.  Nobody's saying that they're not.  His

13 family's -- you heard his family.  They know that this was a

14 bad crime.  They know that.  We know that kids were

15 victimized by the replaying of these images, but, Your

16 Honor, these images are out there.  The reality, the sad

17 reality, is without William McCarthy, those images are still

18 out there.  And I'm not minimizing what he did, but I'm

19 saying those kids unfortunately are going to be harmed, and

20 that's just the reality of life.

21        Now, we did cite the *Grinbergs* case from Nebraska,

22 which makes the point which we're making that there's a

23 difference between a possessor and a distributor, a

24 possessor and a producer, a downloader and a buyer.  He was

25 a typical downloader.  That's what Dr. Shaw said.  He did

1  have a high volume of downloading, but you heard him explain

2  how his computers are powerful; they have a lot of memory, a

3  lot of storage capacity.  He's a computer geek.  He

4  downloaded a lot of stuff.

5          But the purpose of the downloading enhancement is

6  supposed to go to culpability.  You're supposed to be more

7  culpable if you download 600 images than if you download

8  less.  What Dr. Shaw is saying is the more -- the people

9  he's seeing more and more are downloading more and more

10 because their computers are better, and when you have a

11 downloading process like he was using, you download a lot of

12 images.

13         But in addition, besides the crimes --

14         THE COURT:  Is this terabyte of information --

15 isn't that what I think Mr. Brown called it, a terabyte?

16         MR. BROWN:  Yes, Your Honor.

17         THE COURT:  That's the 1 TB you now see on the new

18 computers?

19         MR. KHONSARI:  Yes, Your Honor.

20         MR. DARKEN:  But in addition to looking at the

21 nature and circumstances of the crime, Your Honor -- well,

22 let's make this point.  You know, we've heard about *Irey*

23 here.  Here he didn't touch anyone.  There's no evidence he

24 wanted to touch anyone because he's not one of these, you

25 know, trolling cases where he's out trying to contact young

1  kids.  It's just a downloading case.  It's a bad case.  It's

2  a five-year mandatory minimum case, but it's not, you know,

3  more than it is.

4         On the other side, you have to look at his history

5  and characteristics under 3553(a) also.  That was the point

6  of bringing -- look at all these people.  They're filling

7  this side of the courtroom.  I mean, I've done a couple

8  child pornography cases.  This is not usual for what I see,

9  this kind of support network.

10         You heard the nephew testify.  He lived with

11  Mr. McCarthy for ten years, and Mr. McCarthy was like a role

12  model for him, helping him grow up, nothing inappropriate.

13  You heard about the friend with the 11-year-old daughter.

14  This is not a typical child pornography defendant with this

15  type of support system.  And that -- we've cited on page 11

16  of our sentencing memorandum, a couple cases where there

17  were departures or variances for those type of reasons.

18         You also heard about his Air Force service.  He

19  served for four years, got an honorable discharge.  He was a

20  sergeant.  He was in reserve duty after that.  That's also

21  something to factor in.

22         I want to make a point about the five-year

23  sentence.  I was a young prosecutor in Tampa in the 1990s

24  when Your Honor was there, and I was a soldier in the war on

25  crack.

1          THE COURT:  In fact, you and Mr. Brown used to be

2   quite similar.

3          MR. DARKEN:  Well, I was a soldier in the war on

4   crack cocaine back then, and I participated in

5   sentencings -- big sentencings, long sentencings, and I hope

6   this isn't the case, but I think it may be human nature that

7   when you are in cases where sentences are long, you get used

8   to thinking in those terms.

9          But five years in a human life is a long time.

10  I'm going to take my sons to college next Friday.  Five

11  years ago, they were just going to eighth grade.  Five

12  years is a long time, and you have to give him five years, so I

13  don't -- I'm hoping that the Court's not going to be

14  thinking five years, you know, that's nothing.  Five years

15  is a long time for him to be away from all these people.  So

16  five years is, in our opinion, a significant sentence.

17          And we cited Judge James Lawrence King for the

18  deterrence purpose.  We said a five-year sentence is all

19  that's necessary for both specific deterrence of

20  Mr. McCarthy and for general deterrence, and we cited James

21  Lawrence King, the *Riley case:  "Five years in prison is a

22  serious punishment that will adequately deter the defendant

23  and others from committing this offense in the future."

24          We cited a Nebraska case:  "Five years is a

25  significant term of imprisonment for a first offender.  The

1 mere fact of his prosecution and conviction will deter

2 others from engaging in this conduct.  The deterrent value

3 of any longer sentence would be marginal."

4          Five years is long enough, Your Honor, for this

5 crime.

6          One moment, Your Honor.

7          I just want to point out a few additional facts.

8 You heard Dr. Shaw.  He testified that the defendant is not

9 a pedophile.  He's not a psychopath.  He has what Dr. Shaw

10 testified was normal sexual orientation.  He's amenable to

11 treatment.  He's cooperated with the government's

12 investigation.  He consented to the forfeiture of his house.

13          When he gets out of prison, Your Honor, you know,

14 he's starting from scratch.  He's given up his house, so for

15 all those reasons, he's a low risk of recidivism.  He's

16 susceptible to treatment, and in this risk analysis, I

17 wanted to bring the Court a couple of dates because it's

18 important, I think, when you think about what I think the

19 government's arguing, "Well, he's some risk.  We can't say

20 he's no risk."

21          Here are the dates that I have.  I believe that

22 the investigation -- the monitoring of his computer started

23 in December of 2007.  The search warrant application was in

24 January of 2009, two years -- I'm sorry, a year later, and

25 he was arrested in January of 2000 [sic], another year

1  later.

2          So in other words, the government knew about his

3  activities for about two years before they arrested him, so

4  they didn't think he was such a danger, you know, at that

5  time.  Not that what he did wasn't wrong, but just in terms

6  of this he's a danger, they took from December 2007 to

7  January 2009 to pick him up.  Obviously I think if they had

8  thought he was a real danger of hurting kids, of touching

9  kids, of getting kids, they wouldn't have done that.  They

10 wouldn't have waited that amount of time.

11         So our recommendation is a five-year sentence, and

12 here's what I'm going to ask you to do.  Under 3553(a), as

13 the Court knows, you have to impose a sentence commensurate

14 with all the 3553 factors but no greater than necessary to

15 achieve just punishment for all those factors.  If you

16 decide that five years is not sufficient, I'm going ask you

17 to go to five-and-a-half years, and if you decide that

18 that's not sufficient, I'm going to ask you to go to six

19 years, six-and-a-half years, seven years, in that way.  I'm

20 asking you not to go, "You say five years is not sufficient,

21 Mr. Darken.  I'm going with the guidelines."

22         I don't think that's the right approach under the

23 case law or under 3553, and so it's sort of like I was in

24 church a couple weeks ago and the lesson was about Abraham

25 and Sodom.  And Abraham is arguing with God and Abraham

1  says, "Well, don't destroy -- if I can find 50 people, good

2  people, will you not destroy Sodom?"  God says, "Yes."  He

3  tries to get him down and he goes, "If I can find 40 good

4  people, will you not destroy Sodom?"  Abraham gets him down

5  to ten good people, and then we know what happens after

6  that.

7           I'm asking you to do kind of the reverse, to go

8  with the five years.  That's the mandatory minimum.  You

9  can't go lower than that and apply the 3553 factors --

10          THE COURT:  How many good people do I have to find

11  at that level?

12          MR. DARKEN:  Well, they're here.  They're here.

13  There's more than ten of them.  And if you find that -- it's

14  your decision.  If you find that five years is not

15  sufficient, don't jump to the guidelines.  Just look at the

16  next increment.  I think that's what you need to do.  I

17  think that's what you should do.

18          One moment, Your Honor.

19          That's all I have, Your Honor.

20          THE COURT:  Mr. Brown, I'm going to let you get

21  back up there in view of the fact we took the psychologist's

22  testimony after you made your opening.

23          MR. DARKEN:  Your Honor, Mr. McCarthy does have a

24  final statement before --

25          THE COURT:  He gets the last word.

1          MR. DARKEN:  Thank you, Your Honor.

2          MR. BROWN:  Your Honor, I know you hear this all

3   the time but I will be brief.

4          THE COURT:  Yeah.  I do hear that all the time.

5          MR. BROWN:  I'm sure there's a lot of good people

6   over here.  I'm sure they're all good people, but over on

7   this side of the room, imagine the children that were

8   sexually abused in the 61,000 images and 649 videos, and so

9   this case is not just about the defendant and his family

10  support.  It's also about the people that he perpetuated the

11  violence against and he perpetuated the sexual abuse

12  against, because as the Court knows, Congress has found that

13  each and every viewing of images and videos depicting the

14  sexual abuse of minors reinjures the children and

15  perpetuates the demand -- no matter what Dr. Shaw says, it

16  perpetuates the demand.  Congress has found that.

17         I -- you know, I can't say that this is an

18  extraordinary showing of family support among the child

19  pornography sentencings that I've seen because oftentimes

20  defendants have no criminal history.  They have no history

21  of any type of antisocial behavior, things like that, so

22  oftentimes families show up.

23         But I want the -- and that's a consideration, the

24  history and characteristics of the defendant, a defendant

25  who keeps images of himself naked on the computer, who

1  collects stories of little boys being raped by adult

2  females, who categorized his images on his computer into

3  subdirectories titled "rape" and "virgins" and "PTHC."  So

4  this was not a crime of opportunity or accident.  I mean,

5  this defendant worked for that collection over a four-year

6  period.  He said -- he was candid.  He's been doing it for

7  about four years.

8           And Dr. Shaw couldn't answer that last question

9  that I asked him, whether or not he would trust Mr. McCarthy

10 around his teenage daughter, even though Mr. Taylor would

11 around his 11-year-old daughter.  So the point is that there

12 is no crystal ball here that the Court can look into to say,

13 "Oh, definitely, there's no chance of Mr. McCarthy ever

14 reoffending."

15          And I would just ask that the Court take all the

16 factors of 3553(a) into account and to apply the principle

17 that *Irey* recently affirmed and that is a sentence that's

18 long enough to achieve the statutory purposes of sentencing

19 but not too long.  In other words, the incremental approach

20 up from the bottom is not the right approach.  The approach

21 is not too little, not too much, sort of like, as the *Irey*

22 court referred to, the Goldilocks principle.

23          So I want the Court to remember the victims in

24 this case and to remember the factors of general and

25 specific deterrence, and I would ask the Court -- and also

1 remember the other cases that the Court has had before it

2 and the number of images and sentence the defendant to 121

3 months in prison and a term of life supervised release with

4 conditions.

5          THE COURT:  Mr. McCarthy, is there something you

6 want to say before I impose the sentence?  You have the

7 right to do so.

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Why don't you come up to the podium.

10          MR. DARKEN:  Your Honor, I neglected to address

11 restitution.  If that's an issue, I can do that.

12          THE COURT:  I don't think that issue is before me,

13 is it?

14          MR. BROWN:  Your Honor, we stand by the

15 probationer's assessment in the PSI wherein there's . . .

16          THE COURT:  Okay.

17          MR. BROWN:  That's fine, Your Honor.

18          THE COURT:  Mr. McCarthy, why don't you go back to

19 the podium there.  These guys, I don't know why they don't

20 want to come up here.

21          MR. DARKEN:  That's how we do it in Tampa, Your

22 Honor.

23          THE DEFENDANT:  Your Honor, I would like to thank

24 both my friends and family for the kind words they've said

25 here today and to express my deep regret for the

1  embarrassment and pain that I have brought upon them.  I

2  want them each to know that I will always remember their

3  many kindnesses that they have extended to me over the

4  years, and I hope to one day fully justify their faith in

5  me.

6          I take complete responsibility for my actions and

7  accept the consequences which follow.  I offer no excuse for

8  my behavior.  In allowing myself to engage in these actions,

9  I recklessly endangered the innocent and cavalierly

10  disregarded their suffering.  I have never before caused

11  anyone unnecessary suffering.  I resolve that I will never

12  again.

13          Thank you.

14          THE COURT:  All right.  Having asked the defendant

15  why judgment should not now be pronounced, no cause being

16  shown that would preclude pronouncement of sentence, first

17  let me indicate that I do adopt the guideline calculations

18  contained in the presentence report as well as the factual

19  statements contained therein.

20          It is the judgment of the Court that the

21  defendant, William McCarthy, is hereby committed to the

22  custody of the Bureau of Prisons to be imprisoned for a term

23  of 72 months.  Upon release from imprisonment, he's to be

24  placed on supervised release for a term of ten years.  The

25  standard terms and conditions of supervised release adopted

1  in the Middle District of Florida shall apply.

2       Additionally, he's to participate in a mental

3  health program specializing in sexual offender treatment and

4  submit to polygraph testing for treatment and monitoring

5  purposes.  He's to follow the probation office's

6  instructions regarding the implementation of those

7  conditions.  He's required to contribute to the cost of the

8  services in an amount determined reasonable based upon his

9  ability to pay.

10      He's to register with the state's sexual offender

11  registration agency in any state where he may reside or --

12  in any state where he may reside, as directed by the

13  probation office.  He is to provide the state officials with

14  all information under the Florida sexual predator and sexual

15  notification registration statute.

16      He is to have no direct contact with minors

17  without the written approval of the probation office and

18  shall refrain from entering into any area where children

19  frequent, congregate, and that includes schools, day-care

20  centers, etc. He's prohibited from possessing, subscribing

21  to, or viewing any video magazines or literature depicting

22  children in the nude or in a sexually explicit position.

23      He's not to use or possess a computer with access

24  to any online service at any location without the written

25  approval of the probation officer.  He is to permit routine

1  inspection of any system so authorized by the probation

2  office, its hard drives and other media storage devices, as

3  requested by the probation office.

4         He is to submit to a search of his person,

5  residence, place of business, or any storage unit under his

6  control, computer, or vehicle conducted by the probation

7  officer at a reasonable time and in a reasonable manner,

8  upon reasonable suspicion of contraband or evidence of a

9  violation of this condition.

10         He's to refrain from any unlawful use of a

11  controlled substance, submit to one drug test within 15 days

12  of placement on supervised release, and at least two

13  periodic drug tests thereafter as directed by the probation

14  office.  I am going to order random drug testing not to

15  exceed two per week.  He is to cooperate in the collection

16  of DNA as directed by the probation officer.

17         Based on his current financial status, the Court

18  waives the imposition of a fine and applicable costs of

19  supervision and imprisonment.  However, it's ordered that he

20  pay to the United States a special assessment of $100, which

21  is due immediately and is mandatory.

22         I think whatever -- there has already been a

23  forfeiture in this case?

24         MS. GLOBER:  Yes, Your Honor.  We filed a consent

25  motion for forfeiture -- it's document 49 -- which

1  references the stipulation that we entered into, and that is

2  for a preliminary order of forfeiture for real property

3  located at 1867 Kings Court, Jacksonville Beach, Duval

4  County.  Your Honor, I don't believe that you have signed

5  the preliminary order of forfeiture yet.  We would ask, if

6  you find the motion appropriate, that you do so today.

7           THE COURT:  I have before me a consent motion and

8  memorandum for a preliminary order of forfeiture, but it's

9  docket 49.

10          MS. GLOBER:  49, Your Honor.  Yes.

11          THE COURT:  Is that the correct --

12          MS. GLOBER:  Yes.  Yes.  That's the consent

13  motion.

14          MR. KHONSARI:  And, Your Honor, Ms. Glober and I

15  have spoken today, and I would ask, with the Court's

16  permission, that Mr. McCarthy's family be given 72 hours to

17  remove the last items from that home.  I don't believe

18  Ms. Glober has an objection to that.

19          MS. GLOBER:  We do not have an objection, Your

20  Honor, and I also -- if you need it, I have a copy of the

21  order, another copy.

22          THE COURT:  Of the order of forfeiture?

23          MS. GLOBER:  Yes.

24          THE COURT:  I think I got it here.

25          I have signed the preliminary order of forfeiture.

1            All right.  In this case I have considered the

2   sentencing guidelines, the advisory recommendation.  I'm

3   fully aware of the minimum mandatory required by statute and

4   the Title 18, Section 3553 factors and find that the

5   sentence imposed is reasonable, meets the statutory purposes

6   of sentencing, and find that given the facts of this case

7   and the circumstances of this defendant, the guideline range

8   is an unreasonable sentence.

9            I have considered, as I've indicated, 3553(a)(1)

10  and (a)(2), and I have considered the defendant is, one, 57

11  years old.  This offense started four years ago at 53.  This

12  defendant does not have any criminal history whatsoever;

13  that based on the evidence that's presented, this defendant

14  does not pose a threat to children or adolescents, as the

15  case may be.  I have also considered the substantial family

16  support in this case, and I agree with counsel that it is

17  unusual in this type of case.

18           I understand the government's position about the

19  number of -- the number of images, but I'm also aware that I

20  think under the guidelines, whether it's 600 or whatever the

21  number is, it's the increase that's been awarded; is that

22  correct?

23           PROBATION OFFICER:  Yes, Your Honor.

24           THE COURT:  All right.  So I have considered the

25  nature and circumstances of the offense as well as the

1  history and characteristics of the defendant, which bodes to

2  a lesser sentence than that proposed in the guidelines.

3       I think the six-year sentence that the Court has

4  imposed is sufficient to deter this type of conduct, to

5  protect the public from further crimes of the defendant, and

6  I think it shows or reflects the seriousness of the offense

7  for which the defendant has entered a plea of guilty and has

8  been sentenced.  As I've indicated, I think the sentence

9  imposed is reasonable, and under the circumstances of this

10 case, the guideline range is unreasonable.

11      Mr. McCarthy, you have a right to appeal from the

12 judgment and sentence that I've just imposed.  To do so, you

13 have to do that, I believe, within 14 days.  Failure to

14 appeal within the 14 days means you waive your right to do

15 so.

16      And I might point out that I believe the plea

17 agreement that you executed in this case does contain a

18 waiver of your right to appeal, either directly or

19 collaterally, unless one of four things happen:  First being

20 a sentence in excess of the guideline range that I addressed

21 a moment ago; second being a sentence above the statutory

22 maximum, and that didn't occur; a sentence in violation of

23 the law separate and apart from the guidelines, and I have

24 no opinion on that; or if the government exercises its right

25 to appeal the sentence, which it does have.

1            As I've indicated, you have 14 days from today's

2    date to execute any appeal that you may have under these

3    circumstances.  Failure to do so means you waive your right

4    to appeal.  If you wanted to appeal and couldn't afford an

5    attorney, one would be appointed to represent you at no cost

6    to you.

7            Having pronounced sentence, does counsel for the

8    defendant or the government have any -- I think there's an

9    issue of remand or what?  Do you want to be heard on it?

10           MR. DARKEN:  I talked to Mr. Brown earlier.  He

11   indicated that he opposes a voluntary surrender.  We would

12   request voluntary surrender.

13           THE COURT:  All right.

14           MR. BROWN:  Your Honor, Section 3143(a)(2)

15   requires a remand in a case like this.  It is a crime of

16   violence.

17           THE COURT:  I think that I am going to remand him.

18   He has to be remanded, and I'm going to do that at this

19   particular point.  He's remanded to the United States

20   Marshal for designation by the Bureau of Prisons.

21           MR. BROWN:  Thank you, Your Honor.

22           Just for record purposes, the United States would

23   object to the sentence as being unreasonable because of,

24   among other things, the substantial variance below the

25   recommended advisory sentencing guideline.

1          Nothing further.

2          THE COURT:  Any objections from the defense?

3          MR. DARKEN:  No, Your Honor.

4          THE COURT:  All right.  Good luck to you.  We're

5  in recess.

6          MR. DARKEN:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          (The proceedings were concluded at 4:46 p.m.)

9                         -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          CERTIFICATE

2

3  UNITED STATES DISTRICT COURT )

4  MIDDLE DISTRICT OF FLORIDA   )

5

6

7           I hereby certify that the foregoing transcript is

8  a true and correct computer-aided transcription of my

9  stenotype notes taken at the time and place indicated

10 therein.

11

12          DATED this 3rd day of May, 2011.

13

14

15                           s/Shelli Kozachenko
                             Shelli Kozachenko, RPR, CRR
16

17

18

19

20

21

22

23

24

25
```